### Tobe Cook alias Henderson Cook v. The State.

*No. 3196.   Decided January 30.*

1. **Murder—Practice—Putting Witnesses Under the Rule.**—Where a defendant on a trial for murder has invoked the rule as to all the witnesses, and it was ascertained, after the State's most important witnesses had testified, that a State's witness when put upon the stand had not been put under the rule, but had been in the court room and had heard the other witnesses testify, whereupon the defendant objected to the introduction of said witness, but he was permitted by the court, over said objections, to testify, *held*, that inasmuch as it was made to appear that the fact that the witness was not put under the rule could not be imputed as an intentional wrong on the part of the district attorney, and that he was not to blame for it, and further, that inasmuch as this witness' testimony was as to matters entirely different from the testimony of the witnesses whose testimony he had heard, the court did not

abuse its discretion in allowing him to testify, and that it did not appear that defendant's rights had in any manner been prejudiced thereby.

2.   **Same—Admissibility of Witnesses not Under the Rule.**—The admissibility of witnesses who have violated the rule, or who have not been placed under the rule, is within the sound discretion of the trial court.   And such discretion will be presumed to be correctly exercised until the contrary appears.   The rule is provided merely to prevent the testimony of one witness from influencing the testimony of another.

3.   **Argument of Counsel—Abuse of.**—Where, in the closing argument to the jury, the district attorney referred to certain evidence as showing a reason for defendant's presence near the scene of the crime, and this was objected to by defendant, because the evidence referred to had been introduced by the State solely for the purpose of impeaching the testimony of defendant's witnesses, at which the district attorney stated to the jury that he called their attention to this testimony exclusively for the purpose of impeaching defendant's witnesses, *held*, that no error is made to appear seriously prejudicing defendant's rights.

4.   **Evidence—Harmless Error.**—Where the wife of the defendant, who was a witness on the stand, was asked by the prosecuting attorney if while her husband was confined in jail at Austin she had not written him a letter containing a certain statement, which she denied having made in said letter; and where, after a contention between the district attorney and counsel for defendant as to the admissibility of all testimony relating to the letter, the district attorney offered to withdraw his objections to defendant's motion to exclude the testimony, which offer defendant's counsel refused, *held*, that inasmuch as but for defendant's counsel refusing to accede to the district attorney's proposition to exclude the evidence the same would have been excluded, and inasmuch as it was in defendant's power to produce the letter and refute the imputation that such a statement would be found in it, no error of a prejudicial nature to defendant is shown.

Appeal from the District Court of Bastrop.   Tried below before Hon. H. Teichmuller.

Appellant was convicted in the court below of murder in the first degree, with penalty assessed at death.   The murdered party was Ida Bell Moore, a young white girl 16 years of age, who was residing at the time of her death with her stepfather and mother, Mr. and Mrs. A. J. Bellamy.   Defendant was a negro about 30 or 35 years of age, who lived about two miles or more from the Bellamys.   On the afternoon of June 19, 1891, between 2 and 3 o'clock, Ida Bell Moore left her mother's house on foot and alone, to visit two young lady friends who were stopping at the house of one Henry Sharp, who lived about one-half mile distant from her own home.   In going from Bellamy's to Sharp's the road ran almost due west until it reached the northwest corner of Sharp's cotton field; then around the west end of the cotton field to the west corner; thence south to Sharp's residence.   Opposite the northwest corner of Sharp's cotton field was an inclosure of timber land and pasture, and this point was about half-way between the Bellamy and Sharp houses.   Ida Bell Moore remained at Mr. Sharp's, with the young ladies she had called to see, until about 5 o'clock p. m., when she left to return home, taking with her a small bunch of flowers

and a bundle of house plants which had been given her by her friends. Not having returned home at the time she had promised to be back, and having never before failed to return at the time she appointed, her mother, Mrs. Bellamy, at 6 o'clock became so uneasy at her protracted absence that she started from her home to meet or find her. She-went down the road as far as the northwest corner of Sharp's cotton field and the southeast corner of the timbered and pasture land, and after passing those corners a short distance she saw the tracks of her daughter, evidently returning in the direction of home, the tracks being quite plain, as it had rained the preceding evening. She went on to Sharp's house, and finding that her daughter had left there at 5 o'clock, started immediately back, trailing her daughter's tracks until she had passed the two corners above mentioned, when her daughter's tracks suddenly stopped, and could be seen no further going in the direction of her home; and at this point, on looking around, she also discovered a very strange and peculiar track of a man, which had been freshly made, and had the appearance of a track made by a man in his stocking feet.

This greatly alarmed her, and she immediately hurried home and informed her husband, who, together with several of the neighbors, started out in search of the missing girl. These parties repaired to the place where Mrs. Bellamy had noticed the tracks, and there they found evidences of a struggle having taken place, saw the tracks of the peculiar shape and size as described by Mrs. Bellamy, and the imprint of the heels and shoes made by the deceased, and also the flowers and small house plants and piece of brown paper which deceased had carried with her when she left Mr. Sharp's house. From that point there were tracks leading through the wire fence into the timbered or pasture land near the corner of the same, which said corner is nearly opposite the northwest corner of Sharp's cotton field, as above stated. From the pasture corner the man's peculiar track above mentioned was seen at intervals going in the direction of a dense thicket about one hundred and fifty yards distant, and in this thicket the dead body of the murdered girl was found. She was not examined to ascertain whether her person had been violated or not; though the conditions indicated that she had been. The physician who examined and testified as to the wounds upon her person, said: "Her neck in front, on both sides of her throat, was blackened with bruises, and I could plainly see what appeared to be prints of human finger-nails on both sides of her throat, which in some places cut entirely through the skin. I also discovered some bruises about her chest and left arm. From the examination I made, it is my opinion that Ida Bell Moore's death was caused by her being choked to death by some person with his hands."

The peculiar track made by the supposed murderer was seen by a number of witnesses, and was measured; and they also gave a descrip-

tion of the tracks. They are thus described by the witness Frank Phillips, and his description corresponds with that given by the other witnesses. He says: "I saw plainly two tracks with the toes pointing in the direction of where the struggle occurred. These tracks were not made by a bare foot, nor with shoes or boots on. There was no heel to either of them, and the toes were not round or square, as in boots or shoes, but were more like the shape of a track made with nothing but a sock on, so as to show more of the shape of the foot. They were of the size of about a No. 8 or 9 boot or shoe in length. In the left track the big toe seemed to go through and touch the ground, and in the back part of the left foot the heel of the foot seemed to touch the ground, and there also appeared to be a hole near the middle of the left foot, where the foot touched the ground. In the right track there appeared to be a seam across the foot near the center, running not straight across the foot, but a little diagonally from the one side to the other, making an impression in the track as if a string was tied around the foot making the track." None of the witnesses had ever seen a boot, shoe, or sandal which made a track such as they described.

Defendant was arrested at his home on June 20, 1891, three days after the murder, and at the time of his arrest had on a pair of sandals, or moccasins, made of the legs of a pair of old boots. His tracks after his arrest, and made with these moccasins, were examined by several of the parties who had examined the tracks found at the scene of the homicide, and they were also measured by the same measure, and the witnesses testified that they believed that the tracks found at both places were made by the same shoes or moccasins, and that the measure fitted exactly. These moccasins, or sandals, were taken off the defendant, and were exhibited in evidence before the jury at the trial, and their description given before the jury corresponded in every respect with the description given by the witnesses as to the character of the tracks and the shoes, moccasins, or sandals which must have made the tracks at the place of the homicide. It was further shown by the evidence, that deceased, at the time of her death, was wearing a large metallic breastpin with sharp edges and points about it at the neck of her dress, and that when this breastpin was taken from her dress over her throat, after her death, the edges and points were found to be badly bent in several places. This breastpin was also introduced in evidence before the jury. When defendant was arrested it was found that his thumb upon his right hand was badly lacerated and torn, and the nail split entirely through, all of which could and might have been done by the breastpin in the struggle. Other evidence tended to show that defendant was not at his home on the day of the homicide, nor was he in his field; and that his presence and his lurking around Sharp's cotton field and the scene of the homicide was accounted for upon the theory that he had gone there to see and perhaps fill an assignation with one

of the Fox girls, a negro girl who was that day hoeing cotton in Sharp's field.

The defense was an *alibi*, and that defendant was at home plowing in his field all day Wednesday, which was the day of the homicide. This is directly contradicted by several witnesses who worked in the same inclosure that day, and who testified that if defendant had been plowing in that field during that day they would most certainly have seen him, which they did not.

*J. P. Fowler, R. M. Siddall,* and *R. L. Batts,* for appellant.

*R. H. Harrison,* Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—Appellant was indicted for and convicted of murder in the first degree for the killing of one Ida Bell Moore. Appellant was a negro man; the deceased a young white girl, about 16 years of age. The evidence shows that the murder was committed by the deceased having been choked to death, and also shows conclusively that it was committed in the perpetration, or attempt at the perpetration, of rape. At the trial appellant was found guilty of murder in the first degree, and his punishment assessed at death.

The record in the case is very voluminous, and the evidence entirely circumstantial in character; but while the testimony is circumstantial in character, a most mature consideration of it in its various phases has forced upon us the conviction that it is conclusive, and establishes the defendant's guilt of this most heinous crime beyond all reasonable doubt.

We do not deem it necessary to discuss this testimony, or even recapitulate it, in its most important features. Suffice it to say, that in our judgment it abundantly sustains the verdict, and fully warrants the judgment, which inflicts the extreme penalty of the law. We propose only to notice the three bills of exception reserved by the defendant to the ruling of the court during the progress of the trial.

Defendant's first bill complains of the action of the court in permitting the State's witness McCaskill to testify. At the commencement of the trial the defendant invoked the rule as to all the witnesses who were to testify in the case. It appears that several of the State's most important witnesses had testified, and that witness McCaskill, who had not been put under the rule, was present in the court room and heard them testify. When he was called to the stand the defendant objected to him as a witness because of this fact, but the court permitted him to testify. In explaining the bill of exceptions reserved to this action, the learned trial judge says: "The said McCaskill was permitted to testify in the discretion of the court because it appeared that the witness was

not intentionally in violation of the rule, and that the State's counsel were not to blame for it, and because the tracks concerning which this witness testified were seen by him at a different time and place from that testified to by other witnesses." The admissibility of witnesses who have violated the rule, or who have not been placed under the rule, is within the sound discretion of the trial court, and such discretion will be presumed to be correctly exercised until the contrary appears. Sherwood v. The State, 42 Texas, 498. The trial judge is invested with a wide discretion with regard to this feature of the trial, and such discretion will not be revised on appeal unless it has been abused. The rule is provided merely to prevent the testimony of one witness from influencing the testimony of another. Willson's Crim. Stats., sec. 2318. In this instance we do not believe the trial judge has abused his discretion, nor that the defendant's rights have been in any manner prejudiced by the admission of the testimony of McCaskill. As stated above by the learned trial judge, the witness McCaskill's testimony was with regard to matter not testified to by any other witness in the case, and it is not shown that his testimony was or could in any manner have been influenced by the other witnesses whose testimony he had heard before giving his own.

With a view of illustrating the defendant's second bill of exceptions, it is perhaps necessary to observe that the State had impeached the testimony of the colored girl Martha Fox, who was a witness for the defendant, by showing by the witness Kelly that he had seen the defendant in the field with the two Fox girls on an entire day a few days before the homicide; and also by the witnesses Lee and Fortis, that Martha Fox, after the homicide, had told them of facts and circumstances which would go to show that the defendant, if he had not already become so, was endeavoring to become criminally intimate with said Martha Fox. It is further shown, that on the day of the homicide these two Fox girls were chopping cotton in the field at the time of and a few hundred yards from the scene of the homicide. This evidence was manifestly introduced by the State for the purpose of showing the probability of the defendant being at the place of the homicide, and the motive which induced him to be there. With these facts in evidence, the district attorney in his closing argument to the jury used the following language, to-wit: "The State does not insist that the defendant went to the scene of the murder to take the life of Miss Moore. If you will take into consideration the testimony of Jim Lee and Clint Fortis, in connection with the testimony of Dan Kelly, who saw the defendant when he spent an entire day with the Fox girls, who were at the time of the murder in Sharp's field, you will know that Cook was there, and what he was there for." The bill of exceptions recites that at this point "counsel for the defendant called the atten-

tion of the court to the language used, and that the district attorney was using testimony that was introduced exclusively to impeach the witness Martha Fox for the purpose of showing that the deceased was near the scene of the murder at the time of the commission of the offense, and excepted to the language of the district attorney; and thereupon the district attorney said to the jury: "I call your attention to the testimony of Jim Lee and Clint Fortis exclusively for the purpose of impeaching the witness Martha Fox. Proof of the presence of the defendant at the scene of the murder being essential, and it being proved that the Fox girls were hoeing cotton in the field near the scene of the murder." We do not think the remarks of the district attorney were either improper or calculated seriously to affect the rights of defendant, especially in view of the fact that he qualified his first remark by limiting it entirely to the testimony as impeaching testimony. Willson's Crim. Stats., sec. 2321, for collated authorities.

Defendant's third bill of exceptions shows that the prosecution, with a view to impeaching Ary Cook, wife of the defendant, asked her if she had not written a letter while her husband was confined in the jail at Austin on this charge, in which she told him "that he was wrong about being at home on Wednesday [the day of the homicide], but that he would have to stick to it." She replied that she had corresponded with her husband, but had not written to him "that he was wrong about being at home on Wednesday, but he would have to stick to it." It further appears by the bill of exceptions, that at this stage there were several motions and counter-motions made by each party pertaining to this letter and its contents, which finally resulted in a proposition upon the part of the State to withdraw the objections to defendant's motion to exclude all the testimony relating to the letter, which motion was objected to by the defendant, and the evidence, as far as it is above shown, was retained in the case. This being the condition of the matter as shown by the bill of exceptions, we can not see how the defendant can be heard to complain, because but for his action the entire evidence would have been excluded. Moreover, it does not appear to us how he could possibly have been injured by the question asked the witness as to the contents of the letter, and her answer that nothing of the kind was stated in the letter, and especially when it is further made to appear that said letter was in the possession of defendant's counsel, who could have produced and read it, if they had deemed it essential to do so, in order to meet the imputation that such a statement would be found in it.

In so far as the record before us is concerned, it shows a most fair and impartial trial, in which all the rights of the defendant were accorded him, and in which no action is shown in any manner prejudicial to his interests. No exception was taken to the charge of the court

in its presentation of the law with regard to the various phases of the case, and no additional instructions were asked.

Having found no reversible error, and believing the punishment is fully justified by the heinousness of the crime which the defendant has committed, it only remains for us to declare that the judgment is in all things affirmed.

*Affirmed.*

Judges all present and concurring.