## W. T. Bishop v. The State.

No. 4366.   Decided March 28, 1917.

### 1.—Murder—Circumstantial Evidence—Witness Under Rule.

Where, upon trial of murder and a conviction assessing the death penalty,
the evidence was wholly circumstantial, and the record on appeal showed that
before the trial began the court asked if either party desired the witnesses
placed under the rule, and receiving no reply directed the witnesses to take their
seats, when defendant's counsel requested the court to place the witnesses under
the rule, which was refused and to which the defendant duly excepted. Held,
reversible error. Prendergast, Judge, dissenting.

### 2.—Same—Common Law—Statutory Law—Discretion of Court—Rule Stated.

The common law right, as to the separation of witnesses as it now pertains
to criminal procedure, was crystallized into a statute in this State at an early
date, providing that on request of either party, the witness may be sworn and
placed in custody of an officer and removed out of the courtroom to some place
where they can not hear the testimony as delivered by any other witness in
the case, and this, under article 719, Code Criminal Procedure, is termed plac-
ing the witnesses under the rule, and while the trial judge is vested with a wide
discretion as to what witnesses are to be placed under the rule, yet the rule
itself can not be denied or substantially abridged at the arbitrary discretion of
the trial judge. Following McMillan v. State, 7 Texas Crim. App., 142, and
other cases.

:3.—Same—Question Presented—Arbitrary Denial of Rule.

The question here presented is not one in which one or more witnesses are excused from the rule and permitted to testify, but it is one in which the question presented to the court is, whether the arbitrary denial by the trial court of the right to have the witnesses separated while testifying can be sanctioned by this court. Held, that the right to enforce the rule is a right given by law, and should neither be denied nor substantially abridged at the arbitrary discretion of the presiding judge. Following Heath v. State, 7 Texas Crim. App., 464.

4.—Same—Statutory Guarantee—Substantial Right—Judicial Interpretation.

The statute guarantees a substantial right. That the statute should not be annulled by judicial interpretation is to the interest not only of the accused in this particular case, but to the interest of the State as well. To require the appellant to point out with particularity the effect of the refusal of the trial court to accord him the statutory right to have the witnesses put under the rule, would be practically to deny him that right. Following Watts v. Holland, 56 Texas, 54; and other cases. Prendergast, Judge, dissenting.

5.—Same—Rule Stated—Legal Trial—Presumption of Law.

A legal trial is as important as a correct result. We have no disposition to lightly reverse the action of a trial court. Without any tendency to emphasize errors that are immaterial, its judgment should be accorded the presumption the law imparts to it. But the rules of law, by whose observance only can rights be legally determined, are entitled to the same deference, and have an equal claim upon the conscience of a court. Following Scott v. Townsend, 106 Texas, 339.

Appeal from the District Court of Jones. Tried below before the Hon. John B. Thomas.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*Rodgers & Rattikan, James L. Shepherd, A. C. Smith,* and *E. T. Brooks,* for appellant.—On question of placing witnesses under the rule: Welhausen v. State, 30 Texas Crim. App., 623, 18 S. W. Rep., 300; Smith v. State, 52 Texas Crim. Rep., 80, 105 S. W. Rep., 501, and cases cited in opinion.

*E. B. Hendricks,* Assistant Attorney General, for the State.

MORROW, JUDGE.—Appellant was indicted and convicted of murder and his punishment assessed at death.

The evidence was wholly circumstantial. There were more than ninety witnesses. Before the trial began the court asked if either party desired the rule. Receiving no reply, he directed the witnesses to take their seats. About that time appellant's counsel requested the court to put the witnesses under the rule, and this request being refused, appellant excepted.

"The expedient of separating a party's witnesses, in order to detect falsehood by exposing inconsistencies, seems to have been early discovered and long practiced in various communities. Though probably

not in itself older or more widespread than some other fundamental notions of proof, nevertheless its age and universality have come to be more emphasized in our own legal annals because of the instance recorded and handed down in the apocryphal scriptures. The story of Daniel's judgment in Susanna's case has given to this expedient a unique and classical place in our law as well as in our literature." 3 Wigmore on Ev., sec. 1837, p. 2381.

The story of Susanna is familiar. Her accusers testified in the presence of each other to her guilt. She was about to be condemned when Daniel interposed, saying: "Put these two aside, one far from another, and I will examine them." His examination disclosed such discrepancies in their testimony as resulted in the release of Susanna and the condemnation of her accusers. Since then the importance of the separation of witnesses has been regarded as a valuable adjunct to the cross-examination of witnesses and a right accorded whenever demanded in the trial of causes. 3 Wigmore on Ev., sec. 1837, p. 2382; Sir Walter Raleigh's Trial, Jardine Crim. Tr., I, 419; Sidney's Trial, 9 How. St. Tr., 817, 861; Rosewell's Trial, 10 id., 147, 190; Cook's Trial, 13 id., 311, 348, note; Fenwick's Trial, id., 537, 722; Braddon, Observations on the Earl of Essex's Murder, 9 id., 1229, 1278, 1283, 1294; 2 Bishop's Crim. Proc., sec. 1188.

With reference to the matter Mr. Wigmore in his work on evidence (vol. 3, sec. 1839, p. 2388) uses the following language: "No rule, therefore, should ever be laid down which will by possibility deprive an opponent of the chance of exposing perjury. Finally, it can not be left with the judge to say whether the resort to this expedient is needed; not even the claimant himself can know that it will do him service; he can merely hope for its success. He must be allowed to have the benefit of the chance, if *he* thinks that there is such a chance. To require him to show some probable need to the judge, and to leave to the latter the estimation of the need, is to misunderstand the whole virtue of the expedient, and to deny it in perhaps that very situation of forlorn hope and desperate extreme when it is most valuable and most demandable."

From Watts v. Holland, 56 Texas, 54, we take the following quotation:

"The existence of the rule, as applicable to all kinds of cases, is not, of course, to be confounded with the regulations concerning its application to a given case. The common law rule of evidence and procedure confides to the judge a discretionary authority as to when the rule may be invoked and enforced. *In our State no such discretion is extended to the judge in criminal cases;* the statute, art. 662, R. S., Code Proc., gives the *right* to either party to invoke the rule. Brown v. State, 3 Texas Crim. App., 294.

"Whilst it is laid down by text-writers, whose conclusions are well supported by authority, that the enforcement of the rule lies within the discretion of the court, high authority is not wanting to maintain

the rule as one which parties are entitled to *demand* the enforcement of. Alderson, B., in Southey v. Nash, 7 C. & P., 632 (1 Greenl., sec. 432, note 1), expressly recognized it as 'the *right* of either party, at any moment, to require that the unexamined witnesses shall leave the court.' "

From the opinion in the same case we quote the following:

"As thus laid down by both of these standard authorities (1 Greenl. on Ev., sec. 431, and Phillips on Ev., vol. 2, p. 395), what is called 'a *rule*' seems to be intended as such *in fact,* as well as in *name;* a definite regulation prescribed by the law for the conduct of trials— uniform and universal,—to which all parties litigant are entitled, sub- ject to such judicious regulations confided to the judge's discretion as right and justice exact. It is a *rule* for the ascertainment of truth, and the doing of justice, wherever the purposes of both require it; and being a *rule* of law to regulate trials, every citizen, under the Con- stitution and laws of the country, is entitled to its benefits as a part of the law. To capriciously deny it to him to the deprivation of his property, would be to do so without sanction of law—'the law of the land.'

"The refusal in a proper case, to administer to a party the benefits of a rule of law, on which the security in his rights of property de- pended, . . . would amount, in effect, to the substitution of an unregulated, and, as it might be, capricious and despotic, *discretion in name,* but mere personal *will* in fact, for the 'law of the land.' "

From the opinion of Judge Wheeler, in the case of Hipp v. Bissell, 3 Texas, 18, we quote the following:

"When there is no rule, or when the rule is inapplicable, or does not afford a perfect guide, then there is room for discretion, and from the necessity of the case it must exist. There may be cases to which no known rules or fixed principles can be applied; and the discretion which must be exercised can not be the subject of revision. But when there are known rules of action prescribed, there can be nowhere a discretion to dispense with those rules."

The text-writers and authorities discussed so far relate to the right to have the separation of the witnesses given by the common law. This right as it pertains to criminal procedure was crystallized into a statute in this State at an early date providing that on request of either party the witnesses may be sworn and placed in custody of an officer and removed out of the courtroom to some place where they can not hear the testimony as delivered by any other witness in the case. This is termed placing the witnesses under the rule. (Art. 719, C. C. P.)

The impracticability of applying the rule to all witnesses has been recognized both under the common law practice and the enforcement of the statute mentioned. Thus persons assisting in the prosecution or defense and parties to the suit are among those who are exempt, and it happens at times that some witness or witnesses are discovered after the trial begins or by inadvertence overlooked at the beginning of the

trial, and who from these and other causes have heard some of the testimony, and it has been generally held that in determining the circumstances under which such witnesses may or may not testify the court may exercise a judicial discretion, which will not be reviewed in the absence of its abuse. Vernon's Ann. C. C. P., art. 719, and cases cited.

Many cases are listed at pages 398-399, Vernon's Ann. C. C. P., illustrating the application of this principle to various states of fact, and finally the rule deduced from these cases is stated at page 399, as follows:

"On any trial, at the request of either party, the witnesses may be placed under the rule, and those summoned for the prosecution may be kept separate from those summoned for the defense, if the court sees proper to so direct; and they may be placed in the custody of an officer or be allowed to go at large, under a like discretion. The trial judge is invested with a wide discretion in all matters relating to this procedure, and such discretion will not be revised on appeal unless it has been abused, but the right to have witnesses placed under the rule is a right given by law, and it should not be denied or substantially abridged at the arbitrary discretion of the judge. McMillan v. State, 7 Texas Crim. App., 142; Walling v. State, id., 625; Shields v. State, 8 id., 427; Estep v. State, 9 id., 366; Avery v. State, 10 id., 199; Johnson v. State, id., 571; Hoy v. State, 11 id., 32; Cross v. State, id., 84; Powell v. State, 13 id., 244; Walker v. State, 17 id., 16; Kennedy v. State, 19 id., 618; Bond v. State, 20 id., 421; Goins v. State, 41 Texas, 334; Sherwood v. State, 42 Texas, 498; Brown v. State (Crim. App.), 59 S. W. Rep., 1118."

In Clary v. State, 68 Texas Crim. Rep., 290, 150 S. W. Rep., 919, this court, in an opinion written by Judge Harper, used the following language: "The court in approving the bill states that, when the witnesses were sworn, he asked if it was desired that the witnesses be placed under the rule, and no request was made, but that subsequently defendant did make the request. We will state that, when the request was made, it should have been granted, as article 719 of the Code of Criminal Procedure gives to the defendant the right to make this demand at any time while the evidence is being heard."

The question here presented is not one in which one or more witnesses are excused from the rule and permitted to testify, but it is one in which the question presented to the court is, whether the arbitrary denial by the trial court of the right to have the witnesses separated when testifying can be sanctioned by this court.

The appellant's defense was insanity. He introduced some thirty witnesses on the trial. These with the sixty witnesses introduced by the State were permitted to remain in the courtroom during the trial and hear all the testimony.

This court, in the case of Heath v. State, 7 Texas Crim. App., 464, said: "While the law invests a large discretion in trial judges as to the examination of witnesses and the enforcement of the rule when

the same has been requested by either party, yet this discretion is not arbitrary, nor is the statute giving the right merely directory and to be disregarded at pleasure. The right to enforce the rule is a right given by law, and it should neither be denied nor substantially abridged at the arbitrary discretion of the presiding judge. *Being a right guaranteed by law, a defendant should not after a request for its enforcement be deprived of its benefit, unless it should clearly appear that no possible injury could result to him from its relaxation."*

The statute guarantees a substantial right. That the statute should not be annulled by judicial interpretation is to the interest not only of the appellant in this particular case but to the interest of society, the State. To require the appellant to point out with particularity the effect of the refusal of the trial court to accord him the statutory right to have the witnesses put under the rule would be practically to deny him the right. As said by the Supreme Court in Watts v. Holland, 56 Texas, 54, "it would be in its effect a breach of judicial trust to deny the appellant its benefits when the rule is in effect under such circumstances." What discrepancies might have been disclosed by the cross-examination of the witnesses testifying separately, what links in the chain of circumstantial evidence might have been left in doubt, what additional facts on the issue of insanity might have been disclosed had the trial been conducted according to law, are necessarily matters for conjecture. It does not "clearly appear that no injury could have resulted." We do know that in the trial thus conducted the appellant has been condemned to suffer not only the highest punishment prescribed for the offense but the highest punishment that man has the power to inflict.

Chief Justice Phillips, delivering the opinion of the Supreme Court, in Scott v. Townsend, 106 Texas, 339, said:

"A legal trial is as important as a correct result. We have no disposition to lightly reverse the action of a trial court. Without any tendency to emphasize errors that are immaterial its judgment should be accorded the presumptions the law imparts to it. But the rules of law, by whose observance only can rights be legally determined, are entitled to the same deference, and have an equal claim upon the conscience of a court."

Conscious of the fact that appellant has not received a legal trial, uncertain as to the consequences thereof upon his case or upon the punishment, we are constrained by a sense of duty to award him another trial.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, JUDGE (dissenting).—The clear, uncontradicted and unimpeached testimony in this cause establishes, without a shadow of doubt, that appellant committed one of the most horrible murders in the perpetration of robbery it has ever been my duty to consider.

It conclusively shows he lured an old man, John Evins, from his home near Roby to go with him to San Angelo under the false pretense that he would buy Mr. Evins' place. They started in appellant's buggy, and camped out the first night. They went to bed, lying side by side on a pallet made by appellant out of his quilts. In the dead hours of the night, while the old man peacefully slept, wholly unsuspicious of any danger, appellant got up, knocked him in the head, striking him twice with the blade, and twice with the back, of an ax,—the doctor swearing, and the licks demonstrating, that each was fatal. He then robbed him of his money and watch, stripped his body entirely nude, hauled it in his buggy to a tank and threw it therein, intending to conceal it. But the water being too shallow, he waded into the tank, tied a rope around the neck, dragged it out, replaced it in his buggy, hauled it off some distance, dumped it over a fence, dragged it by the rope to a rather secluded place, buried it in a hole and covered it up so as to entirely conceal it from view. He gathered up three buckets full, where deceased's life blood had run on the ground, threw them in the tank, and tried to obliterate every trace of the horrible murder.

While no witness testified that he saw him actually kill and rob Mr. Evins, that he, and he alone, committed these horrible crimes, is so completely demonstrated by all the physical facts, and such a chain of circumstances as no one can for a moment doubt that he alone killed and robbed him. All the testimony excludes the idea that any other than he had any part whatever in the crimes. Every link in the chain of circumstances, and physical facts, is complete and perfect. No link is weak or missing. No full, detailed statement of the testimony of the several witnesses is necessary. While I make this condensed statement from the evidence somewhat chronologically, as a matter of fact, the testimony was not so introduced. On the contrary, the witnesses were introduced and testified without regard to any connected order, and each testified to an isolated fact or facts, so that none of the witnesses could know that his testimony would establish, or tend to establish, any link in the chain which would or could connect to make a complete chain and thereby convict appellant. Some of the witnesses who testified last made out the first links in the chain, and some of these were introduced by appellant himself. There is no contention or suggestion that any witness swore falsely in any particular.

Appellant married on January 1, 1902, in Hamilton County, and lived there nearly four years. After he left that county in 1905 he lived with his family at various places in Mitchell, Scurry and some other counties. He farmed some at first; afterwards worked around at any and everything he could get to do. He frequently talked about buying a place to live. About September 1, 1916, he borrowed a horse and buggy from a neighbor and started out to find and buy a place to move his family to. A day or two later he reached Fisher County and began inquiring for a place to buy. He was told by someone that said Evins had a 160-acre place a few miles in the country for sale. He

inquired of different persons where he could find him, and succeeded in finding him.

Mr. Evins was an old bachelor about sixty-three years old and boarded and worked with a family a few miles from his own place. He had rented his place to another party for 1916, and the renter was occupying it. Mr. Evins had lived in that community many years, and was known by a great many people. He had a cancer on or near one of his eyes. About September 3rd appellant found Mr. Evins at a place where he was at work. He told him his business, and asked him if he had a place for sale. He learned from him that he had such a place a few miles away, and appellant went and examined the place and was satisfied therewith and the price. After satisfying himself that the place and price suited, he then at different times took Mr. Evins in his buggy and went about to different towns for different purposes. He was seen by many persons during this time at these different places with Mr. Evins, and told different ones of them that he was going to purchase Mr. Evins' place. After progressing this far he went over to Sweetwater, and there made some inquiry of one of the attorneys about purchasing land and how the deed could be made and what kind of a deed would be good. While at Sweetwater he got a lady stenographer to typewrite him a letter and a postal card, both of which he addressed to himself, the card to Royston and the letter to Roby, signing the name C. H. Cable to each, purporting to be his lawyer. In the card he wrote that he had written to him at Roby not knowing at which postoffice he would get his mail, and that he had given him an outline to go by. In the letter he wrote: "Your wife gave me a letter from you regarding which I will state this: have the man from whom you are buying come here to my office in San Angelo; let him bring all his land and town lot papers, also a letter of introduction and recommendation from his banker, then we can fix up his short order. Be sure to have (him) show you and you mark those unmarked or unfenced corners." The card and letter were dated September 9th. He personally applied to the postmasters at the respective places a day or two later and had them delivered to him, which he showed to various persons and to deceased, or told them of having received them and the contents thereof. Mr. Evins had a bank account in a bank at Roby, and had about $700 on deposit there at the time. He went with Mr. Evins to this bank, and the matter was explained to the bankers, and the banker gave to Mr. Evins a letter of introduction and recommendation dated September 12th. At this time Mr. Evins, on his check, drew some more money from the bank, having drawn some a few days before, telling that he was going to San Angelo with appellant and might need some more money. Appellant and deceased were together from this time until the next night, when appellant killed and robbed deceased. They were seen together by various persons at various places from the time appellant got hold of deceased, and one or both had conversations with various persons about the trade pending between them, and the fact that

they were going to San Angelo to close it up. Late in the evening of September 13th they together reached the railroad town of Longworth on a railroad which ran direct from that station to San Angelo.

After getting their suppers that night they camped right back and near to Mr. Sellers' hotel in an unfenced open space. They went to bed there together on a pallet on the ground made by appellant's quilts, which he carried about with him in the buggy. That night appellant killed Mr. Evins with an ax, striking him with the blade of it two licks, which penetrated his skull, and two other licks on his head with the back of the ax, which crushed his skull. The doctor testified that either of the licks would have proved fatal. The ax was found near the place with blood on both the blade and handle. The ax showed that he had attempted to wipe off the blood from the face and scraped the handle with his gapped knife. When appellant was arrested the next day his gapped knife was found on him, and it was fitted to where the handle had been scraped therewith. The buggy tracks were traced on the ground from where he killed him to a public town tank. The tracks of the buggy were right up to the edge of the water in the tank. The ground where deceased was killed was scraped up and nearly all of the blood from deceased, with the trash and dirt, was placed in three buckets. These three buckets were found in the tank with this fresh blood, dirt and trash in them, the buckets being inverted, two of them out of sight, but the other right at them, part of which could be seen from the bank. There was some blood on the buggy seat and cushion and in the buggy, and drops of blood from where it had been stopped and the body taken out of the buggy into the water. Appellant's tracks in the tank without shoes on were found where the buggy had been stopped. The water where the body had been thrown was shallow and the mud somewhat deep. Where the body had been thrown into the tank the water was not deep enough to entirely conceal the body. He tied a rope around the neck of the deceased, dragged his body out and placed it back in the buggy. He then took the body some distance away on the branch or creek where the tank was, and all crumpled up buried it in a hole partly made by a washing out, and partly dug out by him with a grubbing hoe. The body then was covered up with dirt so as to entirely conceal it from view.

Appellant was seen by various witnesses at this tank with his buggy very early on the morning of the 14th between daylight and sun-up. The grubbing hoe with which the digging and covering up were done, as well as the ax belonged to Mr. Sellers, the hotel keeper. The grubbing hoe was found some days later near where the body was. Early on the morning of the 14th, appellant went to the house of one of the residents of the town, called for water to wash his hands and forearms, telling the man that while down at the tank that morning watering his pony the pony had jerked him into the mud in the tank. He also that morning told different persons that Mr. Evins had taken the train that morning just before day for San Angelo. A witness who

met the train on this occasion testified that Mr. Evans did not get on the train that morning. The place of the burial of the body was discovered by different parties and attention called to it about the middle of the morning of the 14th, but no one was aroused sufficiently to go to the place and ascertain what was buried there until about 12 o'clock, when some parties went there, scraped some of the dirt off and found the leg of a human body. An alarm was given and the justice of the peace and many others went to the place and dug out the body. It was entirely nude. A rope was around the neck. The body was very muddy all over with mud from the tank where it had been thrown in and dragged out, except on the back. At the fence near where the body was buried it was shown that the body was thrown over the fence and dragged from there on the ground to the place where it was buried. This dragging over the weeds and grass scraped off some of the mud and exposed some of the skin on the back. About the middle of that morning appellant alone in the buggy left Longworth and went to Sweetwater. As soon as he reached Sweetwater he bought him an entire new suit of clothes and shirt. When he reached there he had on no top shirt, but an undershirt. His pants and shirt were muddy with the mud that came out of said tank. After getting the new clothes he took them to a barber shop, got a bath and put them on. He took his old muddy clothes in a bundle back to his buggy and placed them therein. Soon after the body was discovered and exhumed, and thoroughly and completely identified as that of Mr. Evins by a great many people, search was made for the deceased's clothes by different persons, but they were never found. Soon after appellant came out of the barber shop he was arrested for the murder. On his person the deceased's watch was found and thoroughly identified, and his title deeds to his tract of land and town lots. Some money was also found on his person, and a purse with some blood on it. The clothes that he had removed at the barber shop were then found in his buggy, as were his quilts, and examined. There was mud and fresh blood on them, the mud corresponding with the mud at said tank.

There are a great many other facts and circumstances, all showing without doubt that appellant killed and robbed the deceased under the circumstances stated, but it is deemed unnecessary to here state them.

Appellant's sole defense was claimed insanity. It is unnecessary to recite the testimony on this point. It is sufficient to say that while weak and only a very few of his witnesses' evidence raised the question, it authorized the court to submit that issue to the jury, which the court did in a correct charge which is in no way attacked either in this or the lower court.

When the case went to trial the court asked both sides if they wanted "the rule" enforced. Neither party then requested it, and the court had the witnesses sworn and seated in the courtroom. However, before any witness was placed on the stand appellant requested the court to enforce "the rule," which he declined to do under the circumstances,

and the witnesses remained in the courtroom and heard all the evidence and proceedings of the trial. Appellant excepted to the refusal of the court to enforce the rule. His bill in no way points out how he was injured, or could have been injured, by the court's refusal to enforce the rule. Nor does the whole record make any such disclosure. In fact, the record makes it clear and certain that he was in no way injured. (Powell v. State, 50 Texas Crim. Rep., 592; Collins v. State, 77 Texas Crim. Rep., 156, 178 S. W. Rep., 345.)

In the recent case of Hahn v. State, 73 Texas Crim. Rep., 409, this court reviewed the authorities, the statutes and decisions of this court on this question of enforcing "the rule," and in a unanimous opinion, held:

"Every text-book writer whom we have examined—and we have examined a large number,—without any exception, lays down in substance this rule which we quote from 38 Cyc., 1369: 'The separate examination of witnesses at the trial is a matter within the discretion of the court which may order witnesses to be separated and examined each out of the hearing of the others. . . . The discretion of the court will not be reviewed on appeal unless there is a manifest abuse thereof.' We also cite as holding substantially, if not precisely the same thing, 12 Cyc., 546; 14 Ency. of Ev., 587; 1 Greenl. on Ev., sec. 432; 1 Thomp. on Trials, sec. 275; Underhill's Crim. Ev., sec. 225; 1 Whart. Crim. Ev., sec. 446, and every other text-book writer on the subject. Mr. Wigmore, cited and quoted by appellant on the subject, in effect, says the same thing. He contends, however, that it is the right of an accused and the courts have no discretion, but he concedes that only a few courts so hold. Every decision of this court and of our Supreme Court when it had criminal jurisdiction is to the same effect as the text-books cited above. Buckler, in his Criminal Digest, vol. 2, p. 1750, says: 'Whether or not witnesses will be placed under the rule rests in the discretion of the trial court, which will not be revised on appeal, in the absence of a showing of abuse and injury to the accused.' Citing fifteen decisions of this court from the Third to the Thirtieth Reports. And on page 1752 he says: 'The admissibility of witnesses who have violated "the rule," or who have not been placed under the rule, is within the sound discretion of the court, and such discretion will be presumed to have been correctly exercised until the contrary appears.' Citing a large number of the decisions of this and our Supreme Court. To precisely the same effect is Judge White, in his Ann. C. C. P., sec. 767, citing many cases.

"But in addition to this, let us go to our own statute and see what it says. In examining trials before magistrates, our statute, article 296, C. C. P., says: 'The magistrate *shall,* if requested by the accused or his counsel, or by the person prosecuting, have all the witnesses placed in charge of an officer, except the witness who is testifying, so that the testimony given by any one witness shall not be heard by any of the others.' Observe the language, the magistrate *shall,*—not *may.* Then

go to the other articles of our Procedure on the same subject, we quote all of them:

" 'Article 719. At the request of either party, the witnesses on both sides may be sworn and placed in the custody of an officer and removed out of the courtroom to some place where they can not hear the testimony as delivered by any other witness in the cause. This is termed placing witnesses under rule.

" 'Article 720. When witnesses are placed under rule, those summoned for the prosecution may be kept separate from those summoned for the defense, or they may all be kept together, as the court shall direct.

" 'Article 721. The party requesting the witnesses to be placed under rule may designate such as he desires placed under rule, and those not designated will be exempt from the rule, or the party may have all the witnesses in the case placed under rule.

" 'Article 722. Witnesses under rule shall be attended by an officer, and all their reasonable wants provided for, unless the court, in its discretion, directs that they be allowed to go at large; but in no case where the witnesses are under rule shall they be allowed to hear the testimony in the case, or any part thereof.

" 'Article 723. Witnesses, when placed under rule, shall be instructed by the court that they are not to converse with each other or with any other person about the case, except by permission of the court, and that they are not to read any report of or comment upon the testimony in the case while under rule; and the officer who attends the witnesses shall report to the court at once any violation of its instructions; and the party violating the same shall be punished for contempt of court.' Observe the language in these articles. (719.) At the request of either party the witnesses on both sides *may* be sworn and placed in the custody of an officer, etc. (Art. 721.) The party requesting the witnesses to be placed under rule *may* designate such as he desires placed under rule and those not designated will be exempt from the rule.

"It is a general rule, held so by many of the decisions of this court, that all rules of procedure are directory and not mandatory, unless the language and context show that the Legislature intended that they should be mandatory. Bizzell v. State, 72 Texas Crim. Rep., 442, 162 S. W. Rep., 861, and cases and text-books there cited and quoted. Art. 58, C. C. P., is: 'All words and phrases used in this Code are to be taken and understood in their usual acceptation in common language, except where their meaning is particularly defined by law.' To the same effect is article 10, P. C. Taking the above statutory enactments, we think it certain that the Legislature intended precisely what they said when they said at examining trials the magistrate *shall* enforce the rule. But in trials before the District Court they confide a discretion to the trial judge and provide that he *may* enforce the rule, and not that he is peremptorily required,—*shall* do so."

Since this opinion Mr. Branch has published his valuable Ann. P. C.

In volume 1, section 344, he lays down the law in full accord with the authorities cited in the Hahn case and cites in point two cases of the Supreme Court when it had criminal jurisdiction and 31 of this court down to and including Collins v. State, 77 Texas Crim. Rep., 156, 178 S. W. Rep., 345.

This court, through Presiding Judge White, in Cook v. State, 30 Texas Crim. App., 607, held: " 'The rule' is provided merely to prevent the testimony of one witness from influencing the testimony of another."

This court, through Judge Hurt, in Davis v. State, 28 Texas Crim. App., 542, held: "To reverse in the absence of probable injury would be contrary to principle."

In this case the testimony of no witness was influenced, or could have been, by the testimony of another. The object of the enforcement of "the rule" was, therefore, completely had in this case. Not only was there an absence of probable injury to appellant, but it affirmatively appears that no injury was done him. Therefore, to reverse this cause "is contrary to principle."

The decision of Judge Morrow herein is in the face of the statute on "the rule" quoted above and all the decisions of this court heretofore rendered on the subject. He goes back to the common law, which our statute and decisions completely abrogate. If his decision is to be enforced, then all discretion is taken away from the trial courts, where it has universally heretofore been held to be, both by our statute and decisions, and they must peremptorily enforce "the rule" under any and all circumstances even though no injury has resulted, or is possible, to an accused. I believe that is not the law, and has never been, and should not be. Statutes of procedure—and the enforcement of "the rule" is unquestionably one of these—are enacted to be followed for the purpose of arriving at and establishing the truth on a trial, and where the truth is unquestionably established by uncontradicted and unimpeached testimony, even though some rule may not be followed, that is all that was ever intended or expected. (Murray v. State, 21 Texas Crim. App., 466; Bizzell v. State, 72 Texas Crim. Rep., 442, and cases therein cited.)

In my opinion, this case should be affirmed and not reversed. I respectfully dissent.