**Ricardo Aldape GUERRA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69081.**

Court of Criminal Appeals of Texas, En Banc.

May 4, 1988.

Certiorari Denied July 3, 1989.

See 109 S.Ct. 3260.

Michael B. Charlton, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and William J. Delmore, III and Robert Moen, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

Appellant was convicted of the capital murder of Houston police officer James Harris. Punishment was assessed at death.

The evidence at trial showed that on the evening of July 13, 1982, Officer Harris was patrolling in a lower middle class Mexican–American neighborhood in Houston. At approximately 10:00 p.m., he was informed by a pedestrian, George Brown, that a black car had only moments before attempted to run over Brown and his dog. Harris, acting on Brown's tip, tried to find the black car. Less than a minute later, Harris came upon a black Buick with a red vinyl top stalled at the intersection of Edgewood and Walker. Harris stepped out of his vehicle, leaving the door open, and spoke to the occupants of the Buick. Appellant, who was the driver, and his companion, Roberto Flores, approached Harris. One of the two then shot Harris three times, the bullets entering the left side of his face and exiting on the right. Three spent nine millimeter cartridges were subsequently found beside Harris' vehicle, and three bullets fired from a Browning nine millimeter pistol were recovered from a house in the direction in which the slugs that killed Harris would have traveled. Harris died from his wounds. Appellant and Flores then fled on foot in an easterly direction down Walker, with one man on the north side of the street firing his weapon and the other man on the south side of the street firing his weapon.

At this time of this incident Jose Armijo and his two children, ten year old Jose, Jr., and two year old Lupita, were driving west on Walker. As they came upon the black Buick and the patrol car blocking the intersection Jose, Sr. stopped the car. When the shots rang out which killed Officer Harris, Jose, Sr. attempted to back the car up and escape from appellant and Flores who were running in the direction of the Armijo vehicle. Unfortunately, before Jose, Sr. could back the car up far enough to turn around, a shot was fired into his car from the north side of the street and he also was fatally wounded. Evidence showed that Jose, Sr. was killed by a bullet from a Browning nine millimeter pistol. Two nine millimeter cartridges were found on the north side of the street. On the south side of the street, officers found two cartridges from a .45 caliber pistol.

About an hour and a half later, at 11:30 p.m., Officer Larry Trepagnier and Officer Mike Edwards were searching for the suspects several blocks away from the scene of the previous shootings. As they shined their flashlights into an open garage, gunfire erupted from the garage. Officer Trepagnier, although wounded five times, returned fire and attempted to pursue the shooter who ran around the side of a house. Other officers, hearing the shooting, quickly ran to Trepagnier's aid and killed Flores. Appellant was discovered nearby hiding under a trailer. Under Flores' body was found a Browning nine millimeter pistol. Testing showed that this weapon killed Jose, Sr. It could not be positively shown that this was the weapon that had killed Harris. Also found on Flores were a magazine containing 20 additional nine millimeter rounds. Inside Flores right front pants pocket were eleven more loose rounds of nine millimeter ammunition. Tucked inside the waistband of Flores' pants was Harris' service revolver. Appellant was not armed when found; however, some two feet from where appellant was lying officers found a red bandana wrapped around a .45 caliber pistol. Ballistics tests showed that this pistol had fired

the .45 cartridge casings found on the south side of Walker.

Authorities learned that the Browning nine millimeter pistol had been purchased by an individual by the name of Alfredo Montalbano from a store on June 19, 1982. Montalbano told authorities that Roberto Flores had approached him inside the store, gave him $550.00 and asked him to buy the gun. According to Montalbano he bought the gun and two boxes of nine millimeter ammunition and gave them to Flores.

The contested issue at trial was who had actually shot Officer Harris—appellant or Flores. Several people witnessed the events surrounding the shooting but their versions contradicted each other as to who actually fired the gun at Harris. One of the most damaging witness as to appellant was ten year old Jose Armijo, Jr. Jose Jr. testified that he was riding in the car with his father and sister. When his father turned down Walker and discovered that the street was blocked by the Buick and the patrol car, he stopped the car. Jose testified that the Buick was between his father's car and the police car. Officer Harris was beside the open door on the patrol car. Appellant and Flores both had their hands on the hood of the patrol car, with appellant standing closest to Harris. Jose, Jr. testified that as he watched, he saw appellant make a motion as if to scratch his back. Appellant then took out a gun and shot Officer Harris. Jose testified that he saw one of the men get the officer's gun. At that point Jose, Sr. began backing up his car. Both men began running down opposite sides of the street. Appellant ran down the north side of the street, next to Jose, Jr.'s side of the car. As appellant ran by their car, he aimed his gun into the car and shot Jose, Sr.

On direct examination, Jose, Jr. testified that he went to a lineup several hours after the shooting. Although he recognized appellant as the fourth man in the lineup, he did not tell the police because he was afraid that appellant might harm him if he told the truth. Jose, Jr. also testified that prior to the shootings he had seen appellant driving the Buick around the neighborhood.

On cross-examination, Jose, Jr. admitted that he had given a sworn statement the night of the shooting in which he said that he did not know what the killer looked like. On redirect, Jose, Jr. testified that he was afraid to tell the truth immediately after the killings but he was telling the truth now when he identified appellant as the killer.

Patricia, Diaz testified that she was driving her car down Walker the night of the shootings when she came upon the patrol car and the Buick blocking the intersection. She stopped some three feet behind the Buick. On direct, she testified that she noticed only one man standing besides the driver's side of the Buick pointing towards the police car. As she was pulling up she thought she heard the police officer yelling "Stop, stop." Diaz testified that at that point she became scared and looked down. Four shots immediately rang out. The next time she looked up she saw people from the neighborhood running towards the police car. She testified that appellant was the man she saw pointing towards the police car. On cross, Diaz testified that she did not see appellant actually shoot a gun, she just saw his stance immediately prior to the shots.

Fifteen year old Herlinda Garcia testified that she was walking down Walker with her baby and her sister Vera when they saw the Buick stop in the middle of the street. Appellant who was driving told the girls his car needed a boost and asked if they had any cables. At that point the police car pulled up behind the Buick. Officer Harris put a spot light on appellant, got out of his car and told the men to "Hold it." Appellant and his passenger got out of the Buick. Garcia testified that she then saw appellant pull something out of his pants and shoot the policeman. When she saw the policeman fall to the ground she started running down the south side of Walker. She saw appellant running down the north side of Walker. As she was running, she heard more gunshots behind her as if one of the men was chasing her. She ran until she reached her house. A few hours later, she also viewed a lineup at the Houston police department at which

time she picked appellant as the man she had seen shoot Officer Harris. On cross-examination, Garcia testified that at the time of the shooting, Officer Harris was somewhere between the patrol car and the Buick. Roberto Flores had his hands on the top of the Buick and appellant had his hands on the hood of the patrol car. Appellant then reached into his pants and pulled something out of his pants and began shooting.

The testimony of Vera Flores, sister of Herlinda Garcia, was similar to that of her sister's. Vera testified that the man in the car asked if they had any cables. She told him no. She then began walking. Suddenly she heard someone say, "Stop." Thinking someone was talking to her, she looked back and saw Officer Harris standing beside his patrol car. The two men from the Buick went up to the police car. Suddenly, she heard a scared voice saying, "No, no," and then gunshots. Although she did not see a gun, she testified that appellant who had been the driver of the Buick fired the fatal shots. When quizzed by the prosecutor as to how she knew the driver had shot Officer Harris, she replied because she saw him start running down the street and fire additional shots. Vera related she then took cover behind a parked car. Vera related that she also viewed a lineup shortly after the shootings. Even though she recognized the fourth person in the lineup as appellant who had been the driver of the Buick, she did not tell the police because she was afraid. However, approximately a week after the incident, she told the prosecutors that she could identify appellant. On cross-examination, she too admitted that she had made a false sworn statement when she initially told the authorities that she could not identify anyone. She further testified on cross-examination that after she heard the officer tell the men to stop, she saw both appellant and his passenger walk to the police car and put their hands on the hood of the police car, with the passenger standing closest to the police officer. Although she heard the gunshots, she could not say whether appellant or his passenger shot Officer Harris. Finally on redirect, Vera testified that her original statement made to police immediately after the shooting that she saw the driver of the Buick pull something from the front of his pants and shoot the police officer was correct. However, on recross when defense counsel asked if she saw the driver actually shoot Officer Harris, Vera testified that she did not remember.

Hilma S. Galvan testified that she also saw the Buick and the police car stopped in the middle of the intersection. She stood in front of her house as the appellant got out of the Buick. When Officer Harris pulled his patrol car to a stop, he got out of the car and told appellant to come to him. However the appellant kept walking. Harris again called for appellant to come back. At that point, the appellant turned around and began walking towards the officer. Galvan testified that all of a sudden she heard gunshots and saw the officer fall. Although she did not see appellant holding a gun, she did see the flash from the gun as the weapon was fired. Galvan testified that she hurried into her house where she stayed until Jose Jr. knocked on her door and asked her to go help his father who had been mortally wounded. Galvan also testified that when she saw appellant at the time of the shootings, she recognized him as having been a customer in a convenience store where she formerly worked. She also picked appellant out of the lineup as the man who had shot Officer Harris. On cross-examination Galvan testified in accordance with her written statement that she did see Officer Harris try to approach appellant and grab hold of him immediately before the shooting. Immediately after he shot Officer Harris, appellant then turned his gun on Herlinda Garcia and her baby. Then appellant began running down the north side of Walker Street.

After the State rested, the defense introduced the testimony of two teenage boys, Jacinto Vega and Jose Heredia. Both boys testified that they saw the passenger shoot Officer Harris. Vega testified that he could not recognize either the passenger or the driver. Heredia testified that he saw Roberto Flores shoot Officer Harris. On cross-examination, the State attempted to

impeach the testimony of both witnesses through their prior inconsistent statements and the fact that they were acquaintances of appellant and that they were afraid of appellant.

Jose Manuel Esparza testified that he was appellant's housemate. Esparza testified that on the night of the offense he and Jose Luis Torres Luna were at their house drinking beer when they heard shots ring out nearby. A few minutes later, Roberto Flores came running into the house and announced that he had just shot a policeman. Flores was carrying his nine millimeter gun and had the policeman's gun stuck in the waistband of his pants. Esparza testified that he ran outside and appellant also came running up but did not say anything. Esparza testified that he made the two men leave the house. Shortly thereafter police came and searched the house. Right after they left the house, the second gun battle erupted in which Flores was killed.

Jose Luis Torres Luna's testimony was identical to Esparza's testimony with the exception that Luna testified that appellant told him that Flores had killed the policeman.

The defense closed their portion of the case with the testimony of appellant. Appellant related how the car he was driving stalled and how the police car pulled up behind them. When Officer Harris called to them, appellant related that he went over to the police car and placed his hands on the hood. He could not see Flores because he was standing behind him. According to appellant, Officer Harris had his gun pulled out and was telling Flores to come over to the police car when appellant heard shots close to his ears. Then he saw Officer Harris fall to the ground. Flores went over to the officer and picked up his gun. Appellant then testified that he and Flores then took off running. Appellant related that he ran down the south side of the street and while running, took out his .45 caliber pistol and fired two shots into the air because he thought someone was chasing him. He could not see Flores. When he reached his house, Flores was

already there. Flores told appellant that he had shot into the Armijo vehicle. Because he was scared, appellant ran out the back door of the house and hid behind the horse trailer until he was found by the police.

In rebuttal, the State called Houston police officer Jerry Robinette to the stand. Robinette said that after Flores had been killed and Officer Trepagnier had been shot, he was interviewing all of the witnesses in the area when he saw Jose Manuel Esparza and Jose Luis Torres Luna walking up to the house with several other men. Robinette interviewed Esparza and Luna who told him that they had been at the house when appellant and Flores left in the Buick but then they had left the house and had not been back all evening. Robinette testified that neither man said anything about seeing the appellant and Flores after the shooting of Officer Harris.

V.T.C.A., Penal Code, Section 19.03(a)(1), provides that a person commits capital murder when:

> "the person murders a peace officer or fireman who is acting in the lawful discharge of an official duty and who the person knows is a peace officer or fireman;"

In two points of error, appellant complains that the evidence is insufficient to show that Officer Harris was in the lawful discharge of an official duty. In point of error fourteen, appellant argues that the evidence fails to show that the officer was making a valid Chapter 14 warrantless arrest. Therefore he was not acting in the lawful discharge of an official duty.

The recent case of *Montoya v. State*, 744 S.W.2d 15 (Tex.Cr.App.1987), also concerned the capital murder of a police officer. Montoya argued that because the evidence showed that the police officer was not making a lawful arrest, the officer was not acting in the lawful discharge of his official duty. Thus, Montoya argued, if he was guilty, he was not guilty of capital murder but rather of the lesser included offense of murder and the jury should have been so instructed. This Court disagreed and held that the requirement of a lawful

arrest was not required to demonstrate that the officer was acting within the lawful discharge of his official duties. The Court found that as long as the officer was acting within his capacity as a peace officer, he was acting within the lawful discharge of his official duties. Applying this reasoning to the instant case, we find that since the determination of whether the officer was engaged in making a valid arrest at the time of his death is not necessary to the resolution of whether the officer was acting within the lawful discharge of his official duties, we are compelled to overrule this point of error.

In point of error fifteen, appellant argues that the evidence does not show the nature of Officer Harris' official duty. The uncontradicted record shows that Officer Harris was assigned to a K–9 patrol unit of the Houston Police Department. At the time of his murder, he was on duty, in uniform, driving a marked patrol car and accompanied by his K–9 partner. Additionally the uncontradicted evidence shows that immediately before Officer Harris encountered appellant and Roberto Flores, he had been stopped by a citizen who informed him that the vehicle driven by appellant had almost run over the citizen. Everything in the record before us points to the fact that Officer Harris was clearly engaged in his "official duty" and a rational trier of fact could have so found. *Moreno v. State,* 721 S.W.2d 295 (Tex.Cr.App.1986); *Selvage v. State,* 680 S.W.2d 17 (Tex.Cr.App.1984). Appellant's fifteenth point of error is overruled.

We now turn to the points of error dealing with the punishment phase of the trial. During the hearing on punishment, in addition to the evidence introduced at the guilt-innocence phase of the trial, evidence was introduced to show that appellant, Roberto Flores and one of the defense witnesses at guilt-innocence, Enrico Luna Torres, committed a robbery at a gun store only five days before the instant offense. Witnesses testified that Roberto Flores entered the store, pulled a pistol and instructed the two customers and two employees of the store not to move. Appellant and Torres then appeared. The customers and employees were herded into a back storeroom of the store and made to lie face down on the floor. The robbers then bound the victims hands behind their backs with adhesive tape. After everyone was bound, the robbers proceeded to steal guns and ammunition worth $15,807.31. Taken in the robbery were twenty-two pistols, a MAC 10 .45 caliber submachine gun which is capable of firing 1180 rounds of .45 caliber ammunition a minute, a Thompson submachine gun which is capable of firing 550 to 600 rounds of ammunition a minute, an Inland .30 caliber Paratrooper model which is capable of firing 850 rounds of .30 caliber carbine ammunition a minute, a Remington 870 pump 12 gauge shotgun, 500 rounds of nine millimeter ammunition, 400 rounds of Winchester .357 ammunition, 1000 rounds of .45 ammunition and twelve boxes of 12 gauge ammunition. The robbers made no attempt to take the wallets or jewelry of their victims and nothing was taken from the store's cash register.

In his seventeenth point of error, appellant argues that the trial court erred in admitting into evidence the unadjudicated extraneous robbery without giving formal notice to the defense. He argues that this lack of notice denied him due process.

This Court has previously held that, absent a showing of unfair surprise, proof of unadjudicated, extraneous offenses at the punishment stage of a capital case is admissible. *Hogue v. State,* 711 S.W.2d 9 (Tex.Cr.App.1986); *Williams v. State,* 622 S.W.2d 116 (Tex.Cr.App.1981); *Garcia v. State,* 581 S.W.2d 168 (Tex.Cr.App.1979). Appellant does not now make a claim that he was surprised by the introduction of this evidence, nor did he make such a claim at trial. In fact the record shows that appellant filed a pretrial motion asking that he be given a specific description of any extraneous offense which the prosecution was going to use at the punishment phase of the trial. This motion was granted by the trial court. Indeed at the pretrial hearing appellant's attorney noted for the record that the State was giving him access to the entire State's file. We overrule appellant's seventeenth point of error.

Appellant also argues that the evidence is insufficient to support the jury's affirmative answer to the first special issue, the issue of appellant's deliberateness. Article 37.071(b)(1), V.A.C.C.P. Appellant argues that since there is no evidence that the killing of Officer Harris was premeditated or planned, the jury should have answered the first special issue in the negative. We disagree. In the recent case of *Carter v. State*, 717 S.W.2d 60 (Tex.Cr.App.1986), we wrote that in proving deliberateness, it is not necessary for the State to "prove that the defendant carefully weighed or considered or carefully studied the situation immediately prior to killing the deceased in order for the jury to answer the first special issue" affirmatively.

■ The evidence shows that immediately prior to the shooting, appellant was leaning over the officer's car with his hands on the hood of the car. Rather than wait for the situation to resolve itself in a normal and peaceful fashion, appellant made a conscious decision to pull a gun and proceed to assassinate the officer by shooting him, not once, but three times in the side of the head. Then, rather than render aid to the dying officer, appellant ran down the street, pointed his gun into the open window of a car in which a man and his two young children were sitting and murdered the man by shooting him in the head. Viewing the evidence in the light most favorable to the verdict, we find the evidence sufficient to support the jury's affirmative answer to special issue number one. *Santana v. State*, 714 S.W.2d 1 (Tex.Cr.App. 1986); *Selvage v. State*, 680 S.W.2d 17 (Tex.Cr.App.1984); *Milton v. State*, 599 S.W.2d 824 (Tex.Cr.App.1980). Appellant's sixteenth point of error is overruled.

Appellant also contends that the evidence is insufficient to support the jury's affirmative answer to the second special issue. This Court has repeatedly held that the facts of a given crime may alone be sufficient to justify an affirmative answer to the second special issue. *Santana v. State*, supra; *Holloway v. State*, 691 S.W.2d 608 (Tex.Cr.App.1984); *O'Bryan v.*

*State*, 591 S.W.2d 464 (Tex.Cr.App.1979). We believe that this is such a case.

■ The evidence shows that appellant and his companion armed themselves with pistols on the day of the offense. Without provocation, appellant cold-bloodedly shot Officer Harris three times in the head and then began shooting at various bystanders, including Herlinda Garcia and Vera Flores. While effecting his escape, appellant also killed Jose Armijo, Sr. who was innocently sitting in his car with his two small children. Clearly the facts of this brutal and heinous offense are sufficient in and of themselves to justify the jury's affirmative answer to the second special issue. Furthermore, the only other evidence introduced at the punishment hearing, that dealing with the robbery at the gun store, reinforces the evidence as to future dangerousness. The fact that no money was taken in the robbery and that the robbers were only after firearms and ammunition, we believe shows an intent to obtain firearms for use in criminal acts involving violence. We find the evidence clearly supports the jury's affirmative answer. *Santana v. State*, supra. Appellant's eighteenth point of error is overruled.

■ In his first point of error, appellant contends that the trial court erred in not sustaining his challenge for cause against venireman Charles Deckert. Appellant argues that Deckert evinced a bias against him "as a member of the class of illegal aliens," and was therefore biased "as a matter of law." Article 35.16(a)(9), V.A.C.C.P. We need not address the merits of appellant's claims because our review of the record shows that just after appellant exercised his fifteenth and last peremptory challenge, the following occurred:

"THE COURT: For the record now, based on having reconsidered objections previously made to a juror, Charles A. Deckert, the Court is going to, out of an abundance of caution, grant the Defense an additional strike to be used in lieu of the one that was used on Charles A. Deckert."

Any error which may have been committed by the trial court in failing to excuse Dec-

kert when he was challenged was thus cured. *Williams v. State,* 682 S.W.2d 538 (Tex.Cr.App.1984); *Payton v. State,* 572 S.W.2d 677 (Tex.Cr.App.1978). The first point of error is overruled.

In his second point of error, appellant argues that the trial court erred in sustaining the State's challenge for cause against venireman Thomas Foster Boone in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Boone initially testified that he was philosophically opposed to the death penalty. Asked by the State whether he could imagine himself answering the special issues in the affirmative, knowing that appellant would thereby be assessed the death penalty, Boone replied that he could not. The State challenged Boone for cause. Thereupon defense counsel posed a hypothetical situation for Boone in which an individual kidnapped a bus load of thirty school children, a million dollar ransom was paid and the individual then machine gunned the children to death. Counsel then asked Boone whether, under such a scenario, he could affirmatively answer the special issues:

"Q. ... Now, could you in that kind of situation—

"A. I think in an extreme set of circumstances like that, I could favor the death penalty, yes.

"Q. So you are not automatically opposed against the death penalty, are you?

"A. I guess not, if you include extreme situations.

"Q. There are all kinds of circumstances in this world. We see all kinds in the courtroom, and that is why I gave you that example. There are others, so then you can answer those two questions yes if the evidence called for it and if you believed it beyond a reasonable doubt?

"A. In a situation such as you have described, yes."

The State then questioned Boone further:

"Q. Do you feel like you could be a juror on a capital murder case with the feelings that you have concerning the death penalty? Do you feel like it would be a violation of your feelings and beliefs to serve on such a jury, or do you feel like you could do it? I am not talking about the most extreme set of facts you can think about in your mind, but do you feel like your feelings or beliefs—or to follow the law would be a violation of your feelings or beliefs if you were to serve on such a jury?

"A. I feel I could serve, but I feel my judgment would be affected by my personal objection to the death penalty.

. . . . .

"Q. If you were on a jury, imagine the hypothetical situation with me, imagine you are on a capital murder case and it comes down to the time to answer both of these questions yes. Do you feel like you could answer both of these questions yes knowing if you did so, the man would receive the death sentence?

"MR. ELIZONDO: If the death sentence were called for.

"Q. (By the Prosecutor) Or do you feel you could answer both these questions yes knowing if you do that, the man would receive the death penalty? That is basically the test.

"A. I don't think I could.

"Q. I appreciate it when you say, 'I don't think I could.' When someone hits me in the face with a proverbial cream puff, I am like that type of person who says, 'I don't believe so,' or 'I don't think so,' but I need to find out if you're telling me you could not?

"A. I could not.

"Q. I am not going to try to change your mind, and I'm not going to give you hypotheticals or throw hypotheticals at you. Is that the honest way you feel?

"A. Yes."

The State renewed its challenge and the trial court excused the venireman, over appellant's objection that *Witherspoon* was thereby violated.

Appellant now argues that because the venireman was shown to be willing to accept death as an appropriate punishment under "certain circumstances," he was not "automatically" opposed to imposition of the death penalty, and thus his exclusion was improper.

In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court recently clarified the standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. The Court disavowed the *Witherspoon* standard and endorsed the standard previously announced in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). The *Adams* test provided that a prospective juror could be excluded for cause when the juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 448 U.S. at 45, 100 S.Ct. at 2526, 65 L.Ed.2d at 589.

In *Wainwright*, the Court explained why it preferred the *Adams* test over the *Witherspoon* test:

"There is good reason why the *Adams* test is preferable for determining juror exclusion. First, although given *Witherspoon's* facts a court applying the general principles of *Adams* could have arrived at the 'automatically' language of *Witherspoon's* footnote 21, we do not believe that language can be squared with the duties of present-day capital sentencing juries. In *Witherspoon* the jury was vested with unlimited discretion in choice of sentence. Given this discretion, a juror willing to *consider* the death penalty arguably was able to 'follow the law and abide by his oath' in choosing the 'proper' sentence. Nothing more was required. Under this understanding the only veniremembers who could be deemed excludable were those who would never vote for the death sentence or who could not impartially judge guilt.

"After our decisions in *Furman v. Georgia*, 408 U.S. 238, [92 S.Ct. 2726, 33 L.Ed.2d 346] (1972), and *Gregg v. Georgia*, 428 U.S. 153, [96 S.Ct. 2909, 49 L.Ed.2d 859] (1976), however, sentencing juries could no longer be invested with such discretion. As in the State of Texas, many capital sentencing juries are now asked specific questions, often factual, the answers to which will determine whether death is the appropriate penalty. In such circumstances it does not make sense to require simply that a juror not 'automatically' vote against the death penalty; whether or not a venireman *might* vote for death under certain *personal* standards, the State still may properly challenge that venireman if he refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge. To hold that *Witherspoon* requires anything more would be to hold, in the name of the Sixth Amendment right to an impartial jury, that a State must allow a venireman to sit despite the fact that he will be unable to view the case impartially." 469 U.S. at 421–422, 105 S.Ct. at 851, 83 L.Ed.2d at 850. (emphasis in original)

The Supreme Court also noted that reviewing courts must pay close attention to the findings of the trial court:

... "We note that, in addition to dispensing with *Witherspoon's* reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.... [T]his is

why deference must be paid to the trial judge who sees and hears the juror." 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 851 (footnotes omitted). Clearly the portion of the voir dire examination set out above reveals that Boone testified that under certain severe circumstances, he would be able to vote in such a way that a death sentence would be handed out. However, throughout the entire voir dire examination, it is apparent that the idea of the death penalty would affect the juror in all stages of the decision making process. In *Adams v. Texas*, supra, the Supreme Court wrote:

"If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the Witherspoon doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality." 448 U.S. at 46, 100 S.Ct. at 2527, 65 L.Ed.2d at 590.

After according due deference to the ruling of the trial judge who saw and heard the juror, we are unable to say that the trial judge abused his discretion in granting the State's challenge. *Bell v. State*, 724 S.W.2d 780 (Tex.Cr.App.1986); *Carter v. State*, supra. We overruled appellant's second point of error.

In his third point of error, appellant argues that the trial court erred in excusing venireman James Thomas Tucker upon the State's challenge for cause. Appellant contends that by his answers Tucker never indicated, "unequivocally, that he would automatically vote against the Article 37.-07(1), V.A.C.C.P., special issues because of his feelings about the death penalty, nor did he state that his feelings on the death penalty would frustrate the State's legitimate efforts to administer its death penalty scheme ..."

■ As we noted above in the previous point of error, no longer does the law require an absolute unequivocal answer from a juror before he can be disqualified for a bias against the law pertaining to the death penalty. *Wainwright v. Witt*, supra. Instead, a juror may be removed for cause if the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. at 45, 100 S.Ct. at 2526, 65 L.Ed.2d at 589.

Tucker was an Episcopal priest, who, though he could "understand society's right" under certain circumstances to take a life, harbored substantial doubts whether he could personally participate in the process. Throughout the voir dire it is apparent that Tucker was torn between his own personal beliefs and his duty to society. During questioning by defense counsel the following occurred:

"Q. Could you consider the death penalty in a proper case in your own mind if it is proven to you beyond a reasonable doubt that the answers to those two questions should be yes and it is proven to your satisfaction beyond a reasonable doubt, and, of course, it will be—

"A. Well, I think I have almost made it clear that it doesn't really hinge on the facts, even though I have tried to say my problems are not philosophical, not factual, and I have tried to say my satisfaction and cooperation with the legal systems of this country are based upon an understanding that this is what we have to support society and that God certainly works through that, but philosophically, I believe I would have serious problems with it personally.

.    .    .    .    .

"Q. Sure. All we are asking is: If it is proven to you beyond a reasonable doubt that the answer to those questions should be yes, can you answer them yes?

"A. Could I—do you want a definitive answer here?

"Q. Yes.

"A. I can't give you that. I can give you a—I have—I can say yes, I would

have a definite prejudice against a 'yes, yes' answer. I would hope that I could in some way be objective and serve society, but I can't give you a definite answer on that."

During questioning by the State, the following occurred:

"Q. ... Both sides have the right to a fair and impartial jury ... who is not predisposed to putting everything out of their mind and basing their decision solely on the facts, and (sic) they come from the witness stand.

"A. I think I am afraid I cannot be such a juror.

"Q. I think you are telling us your personal feelings and religious beliefs and philosophy would influence your decision as to 'yes, yes' or 'no, no,' or whatever the facts would be.

"A. I am very much deeply committed personally. I choose not to choose for society. It is difficult for me to decide and to say what society should be. That is very difficult. I am a lot of individual things and deal with other people individually, and yet am a priest of God. I cannot make judgments for society, but make them for myself. I could for myself.

.    .    .    .    .

"Q. Can you tell me unequivocally, if all the evidence were presented and the answers to those questions should be yes, you could answer them yes, or are you telling us, as you did earlier, you don't know what you would do in that situation until you were placed in it?

"A. The latter I have to say because as a good citizen, I—you could present me case after case, and I could as long as I was not personally called upon to stand up and give the sentence. I could say I see the point of society here, but when I am called upon to be the judge, that is when my ability to make a decision ceases.

"Q. And do you feel that in this situation answering these questions yes, you would, in effect, be the one pronouncing the sentence?

"A. Surely.

"Q. Although you would like to be able to follow society's rule and the law, and if the evidence required "yes" answers to those, you can't tell us right now that you would answer those yes?

"A. No, I can't.

.    .    .    .    .

"Q. And if ultimately those feelings did win out, you would either refuse to answer the question or answer it no to prevent the death penalty from being imposed, in guaranteeing a life sentence that would, in other words, take you out of the sentencing portion of it?

"A. I suppose, painful as it would be for me, I would have to choose not to answer somehow, because I don't think I would—I don't know I could insult society, the rules of society, or flout them enough to sit there and purposefully answer them no, even though I think 'yes' on the facts.... And I think I would have to refuse to answer, no matter the cost on that."

.    .    .    .    .

"Q. And in your own words again, I guess if you will just tell us whether or not you feel that you could be fair and impartial to the State, where the State is actively seeking the death penalty in regards to judging the facts and evidence, that means solely on the facts and evidence and nothing else.

"A. There is a good chance I might not be fair to the State, yes, and as painful as that is—because I can appreciate the family of Officer Harris, et cetera, and just as sick at heart about that judgment that took place, however it took place—but still, I am afraid I would not be fair to the State."

■ Clearly Tucker's personal beliefs as to the death penalty would so interfere with his duties as a juror that he would be substantially impaired in following his instructions and his oath. We find that the trial court was correct in granting the State's challenge for cause. This point of error is overruled.

During the voir dire examination of venireman Carolyn Sanders it was established

that in a case where the State had proven that an accused had probably committed capital murder, but not by proof beyond a reasonable doubt, the fact that the accused had not testified, would sway Sanders into finding the accused guilty. The State's challenge for cause on this basis was granted. In his fourth point of error, appellant complains that the trial court erred in sustaining the State's challenge against Sanders in that Article 38.08, V.A.C.C.P., and the constitutional and statutory provisions upon which it is grounded, are not "phase[s] of the law upon which the State is entitled to rely for conviction or punishment." Article 35.16(b)(3), V.A.C.C.P.

Even had error been preserved, we find that appellant's argument is without merit. In *Nethery v. State*, 692 S.W.2d 686 (Tex.Cr.App.1985), the trial court sustained the State's challenge for cause to three veniremen who expressed a bias against the minimum punishment for the lesser included offense of murder. On appeal, Nethery argued that the State should not be permitted to utilize Article 35.16(b)(3) to exclude a venireman when the bias related by the individual is one, such as a bias against the minimum range of punishment, that harms the defendant and not the State. The Court, in reply to Nethery's contention, wrote the following:

> "The State's interest is in fair and impartial jurors, in accord with our legal system's basic tenet to insure that every defendant is accorded a fair and impartial trial. The State seeks, or should seek, to uphold the integrity of the jury system. Therefore the State is permitted to challenge a juror who cannot be fair and impartial because he will not consider the full range of punishment. Whether the State later urges the jury to assess the minimum or the maximum is of no moment." 692 S.W.2d at 691

In *Phillips v. State*, 701 S.W.2d 875 (Tex. Cr.App.1985), this Court held that harm to the State is not a prerequisite for the exercise of a challenge for cause by the State based upon a juror's inability to follow the law. We adopt that holding in the instant case. The mere fact that the bias which the venireman voiced did not harm the State does not mean the State could not challenge the prospective juror because of an inability to follow the law. See also *Turner v. State*, 462 S.W.2d 9 (Tex.Cr.App. 1969), *rev'd as to penalty only*, 403 U.S. 947, 91 S.Ct. 2289, 29 L.Ed.2d 858, *aff'd after commutation*, 485 S.W.2d 282 (Tex. Cr.App.1972). The trial court acted properly. Appellant's fourth point of error is overruled.

In several grounds of error, appellant contends that the trial court unduly restricted his voir dire examination and thereby deprived him of information needed for the intelligent exercise of his peremptory challenges. Before we set out the grounds of error, we summarize the law in this area.

A defendant's constitutional right to counsel includes, inherently, under Article 1, Section 10, Texas Constitution, the right of his counsel to question the members of the jury panel in order to exercise intelligently peremptory challenges. *Campbell v. State*, 685 S.W.2d 23 (Tex.Cr. App.1985); *Powell v. State*, 631 S.W.2d 169 (Tex.Cr.App.1982); *Mathis v. State*, 576 S.W.2d 835 (Tex.Cr.App.1979).

Ordinarily, the trial court should give a defendant great latitude in questioning the jury panel during voir dire. However, the trial court does have the authority to impose reasonable restrictions on the exercise of voir dire examination for various reasons, among them to curb the prolixity of what can become the lengthiest part of a criminal proceeding. *Bodde v. State*, 568 S.W.2d 344 (Tex.Cr.App.1978); *Smith v. State*, 513 S.W.2d 823 (Tex.Cr. App.1974).

Thus a court may restrict repetitious or duplicitous questioning. *Patterson v. State*, 598 S.W.2d 265 (Tex.Cr.App. 1980); *McManus v. State*, 591 S.W.2d 505 (Tex.Cr.App.1980); *Adams v. State*, 577 S.W.2d 717 (Tex.Cr.App.1979); *Bodde v. State*, 568 S.W.2d 344 (Tex.Cr.App.1978). A court may set reasonable time limits. *Ratliff v. State*, 690 S.W.2d 597 (Tex.Cr. App.1985); *Whitaker v. State*, 653 S.W.2d

781 (Tex.Cr.App.1983); *Thomas v. State* 658 S.W.2d 175 (Tex.Cr.App.1983). Moreover, if the prospective juror states his or her position clearly, unequivocally, and without reservation, the trial court does not err in refusing to permit further questioning. *Phillips v. State*, 701 S.W.2d 875 (Tex.Cr.App.1985). Finally, a trial court may also restrict questions asked in improper form. *Adams v. State*, supra; *Abron v. State*, 523 S.W.2d 405 (Tex.Cr. App.1975).

To show an abuse of discretion, a defendant must demonstrate that the question he sought to ask was proper. If the question was proper and the defendant was prevented from asking it, harm is presumed. *Smith v. State*, 703 S.W.2d 641 (Tex.Cr.App.1985). A question is proper if it seeks to discover a juror's views on an issue applicable to the case. *Robison v. State*, 720 S.W.2d 808 (Tex.Cr.App.1986); *Campbell v. State*, 685 S.W.2d 23 (Tex.Cr. App.1985); *Powell*, supra; *Clark v. State*, 608 S.W.2d 667 (Tex.Cr.App.1980); *Smith v. State*, 513 S.W.2d 823 (Tex.Cr.App.1974); *Mathis*, supra.

We now turn to appellant's allegations. In his fifth point of error, appellant complains that his voir dire examination was impermissibly restricted when the trial judge refused to allow him to ask venireman Steven Busby his opinion of the inherent credibility of a police officer as opposed to a lay person. He argues that this restriction in his examination denied him the right to be represented by counsel as guaranteed by Article I, Section 10 of the Texas Constitution and the right to intelligently exercise his peremptory challenges. Appellant complains about the following portion of the record:

> "Q. Let me ask you this: Say, for example, if an illegal alien, which they will be here to testify as to the facts, and a police officer gets up there and testified to the facts, you are not saying you would give a police officer more credibility simply because he is a police officer, hypothetically speaking?
>
> "MR. MOEN: I object to the question. He is staking him out as to how he would

place the testimony of a police officer as opposed to an illegal alien.

> "THE COURT: Sustained.
>
> "Q. All right. Any class of citizens coming in or any citizen that would testify, be it a doctor, a secretary, a manager of a pizza place, a police officer, would you give that police officer more credibility than any other citizen testifying as to the same facts?
>
> "MR. MOEN: I object to the same question again, as to how he would judge a police officer's testimony versus other people and other occupations. I think he has answered the question, that he would judge the police officer's credibility and training and what he is doing. He has also said he would not—I object to the question along those lines, Judge.
>
> "THE COURT: Sustained as to the form."

Thereupon defense counsel did not attempt to rephrase his question in this area but began questioning the juror as to the bifurcated trial process. At no further point in the voir dire examination, did defense counsel attempt to question the juror regarding the credibility of police officers versus the credibility of any other witness.

We find no improper restriction of voir dire for two reasons. First of all, the trial court did not order counsel not to continue questioning in this area. In *Powell v. State*, 631 S.W.2d 169 (Tex.Cr.App. 1982), defense counsel attempted to question the prospective jurors regarding what they believed was the purpose of incarceration—rehabilitation, punishment or deterrence. In sustaining the prosecutor's objection, the trial court told Powell's counsel that he would not be permitted to make similar inquiries of the remaining members of the venire. We reversed the case, holding that such questions were proper, especially considering that Powell was pleading guilty and the only issue for the jury to determine was Powell's punishment. Thus we found that the trial court erred in preventing Powell's attorney from asking the question. In *Campbell v. State*, 685 S.W.2d 23 (Tex.Cr.App.1985), the trial court also imposed an absolute limitation on de-

fense counsel's right to question the prospective jurors on their views as to punishment. Once again we held that such an absolute limitation was error.

In the instant case, we have no such absolute limitation of appellant's voir dire. Appellant's questions constituted an improper attempt to require the prospective jurors to commit themselves as to how they would pass upon the credibility of the police witnesses prior to trial. *Hughes v. State,* 562 S.W.2d 857 (Tex.Cr.App.1978). In sustaining the State's objection, the trial court in no way intimated that appellant could not ask a properly worded question regarding the prospective juror's views on the credibility of police officers. Unfortunately defense counsel made no attempt to ask a properly phrased question of this juror.

In *Abron v. State,* 523 S.W.2d 405 (Tex. Cr.App.1975), this Court noted that a trial court may disallow questions during voir dire which have been asked in improper form. We find that this is what occurred in the instant case. The trial court properly restricted appellant from asking an improperly worded question. *Smith v. State,* 703 S.W.2d 641 (Tex.Cr.App.1985); *McCarter v. State,* 478 S.W.2d 524 (Tex.Cr.App. 1972).

Second, the record shows that immediately prior to the exchange set out above, defense counsel was allowed to explore fully this area with no restriction whatsoever.

"Q. Now, there will be police officers coming and testifying. They will be coming in and out. Do you believe that police officers make mistakes?

"A. Yes.

"Q. Would you agree that they are human and subject to human frailties just as much as you or I or anybody else?

"A. Yes.

"Q. So you wouldn't place a police officer—you wouldn't give them more credibility simply because of the mere fact, without even testifying, they are police officers, would you?

"A. Hard question. I believe they are human, but as far as being a police officer, I would give them some sort of credibility.

"Q. Before they testify?

"A. Oh, no; not before they testify. As they are testifying.

"Q. So the mere fact if we have several witnesses or the State has several witnesses and we have several witnesses, you are not saying to me that before a police officer testified that the mere fact that he is a police officer, you would give him more credibility?

"A. No.

"Q. So, let's put it this way: Would you give him more credibility than any witness simply because he is a police officer, while he is testifying?

"A. While he is testifying? Not so much more, but I would give him some credibility.

"Q. How is that?

"A. Well, it's—I can't say him versus some other officer of the court. I don't see why he would have more credibility. He would have more compared to, I guess, the normal citizen getting up there, to me.

"Q. Irregardless of the facts.

"A. Irregardless of the facts. I would have to give it some credibility, because to me a police officer is trained to spot things, you know, and to look at things. I mean, he is more—he is trained to do a job. In other words, the average citizen, being out someplace, might not be recognized like people, say, if you are talking about—

"Q. You are talking about if he presents to you a scientific test or the fact that he noted something at an intersection or whatever, a description of an intersection?

"A. Yes. I mean, he would be more— he would be able to do that better than I would say the average citizen would.

"Q. But you wouldn't automatically give him more benefit simply because he is a police officer, would you?

"A. You mean as a human being?

"Q. Prior to testifying.

"A. Oh, no, no. Expert witness, I guess, is more—"

Clearly defense counsel was not prohibited from questioning the prospective juror in this area. Counsel was allowed extensive voir dire examination in this area and the trial court was acting within its bounds in excluding improper and repetitious questions. *Mays v. State,* 726 S.W.2d 937 (Tex. Cr.App.1986); *Patterson v. State,* supra; *McManus v. State,* supra; *Adams v. State,* supra; *Bodde v. State,* supra. This point of error is overruled.

In his sixth point of error, appellant contends that the trial court erred in limiting his voir dire examination of venireman Thomas Allen Mock. Specifically, he argues that because Mock "expressed a certain amount of confusion concerning his ability to affirmatively answer the Article 37.071, V.A.C.C.P., Special Issues", counsel should have been allowed to proceed with hypothetical examples in order to discern the impact of his objections to the death penalty on the performance of his duties as a juror.

The record reflects that during voir dire examination by the State, Mock stated that he could not answer both of the special issues affirmatively knowing that the death penalty would result, except perhaps in a situation where the victim had been one of his family members. During the defense voir dire examination, counsel posed a hypothetical involving the kidnap and murder of a girl. Mock admitted that under such a scenario he could find the accused guilty of capital murder. After injecting torture and strangulation into the hypothetical, counsel ascertained that Mock could also find, at the punishment phase, that an accused acted deliberately and with the reasonable expectation that death would result. Finally it was hypothesized that the State could prove the accused had previously committed nineteen other such killings. Mock testified that in that event he could answer the second special issue affirmatively. At this point the State objected that "[the question is could he answer the question yes knowing the death penalty would result.]" Counsel then proceeded as follows:

"Q. You would have answered Questions 1 and 2 yes, correct.

"A. Yes.

"Q. At that point in time, you know your answers to the questions is going to make Judge Oncken kill him, give the death penalty. Could you still answer Questions 1 and 2 yes if you believed him guilty beyond a reasonable doubt?

"A. Well, if I was on the jury?

"Q. Uh-huh.

"A. I had been selected?

"Q. You told me a little while ago you could answer Question 1 yes if you believed it beyond a reasonable doubt and you could also answer Question 2 yes if you believed it beyond a reasonable doubt. Now, when you answer those two questions yes, you know that Judge Oncken will then have to sentence him to death.

"A. That is what I am against.

      .      .      .      .      .

"Q. ... I am trying to figure out if you could answer Question 1 yes if you believed it beyond a reasonable doubt that it should be answered yes?

"A. Knowing the result, I could not answer yes to No. 2 then.

"Q. Okay. No. 2 is asking you to determine if there was a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society. In a hypothetical example, they are allowed to bring in other offenses the 'Defendant may have committed such as, let's say, they bring in a fact situation that he has committed this type of offense before or two or three times before, and if you believed it beyond a reasonable doubt that there was a probability that he would commit criminal acts of violence that would constitute a continuing threat to society, could you answer that question yes?

"[PROSECUTOR]: Same objection as before. Rather than asking what he would do on any specific question, I think the proper question to ask the juror in light

of his responses already given, is there any case he can think of in his mind he could answer the questions yes, knowing the death penalty would result.

"THE COURT: Sustained.

"Q. [By defense counsel] Can you imagine a hypothetical example in your own mind where you would answer Question 1 yes and Question No. 2 yes knowing that your answers to those two questions would have Judge Oncken sentence him to death?

"A. No."

The State then challenged venireman Mock for cause, and the trial court sustained the challenge over appellant's objection.

■ A review of the voir dire examination set out above shows that the appellant was allowed to question the venireman by means of hypotheticals. When, in the context of the hypothetical question, it was clarified for Mock that the result of two "yes" answers would be the assessment of death, Mock made clear he would have to answer at least one question "no" in order to avoid that result. We fail to see what further result appellant hoped to gain by questioning Mock with another vague hypothetical pertaining to the second special issue. Thus we hold that the trial court was within its discretion in sustaining the State's objection to this question. Consequently, there was no improper restriction of appellant's voir dire examination. This point of error is overruled.

Appellant next complains that the trial court improperly limited his voir dire examination of venireman Thurman Howard Matthews regarding Matthew's views of the meaning of the word "deliberately." During the State's voir dire, Matthews was questioned regarding the difference between the terms "intentionally" and "deliberately" and acknowledged that he could answer the first punishment issue "no" after finding a defendant guilty of intentionally committing capital murder. Defense counsel picked up this line of questioning during his portion of the voir dire examination and the following occurred:

"Q. ... Now, some people say that the word deliberately means the same thing as the word intentionally. How do you feel about that?

"A. I believe they are different.

"Q. In which way?

"A. Well, I would have to get into my basic version of deliberate and intent, in which deliberate would be a slow measured approach to something.

"Q. Premeditated?

"A. Deliberate or a very reasonable approach to something, and the intent, I don't know exactly how to give you that answer as to how I differentiate between deliberately and intentionally.

"Q. Okay.

"A. I am sorry. I just—

"Q. That is okay. No apology is needed at all. I am not sure if I have in my own mind what the difference is either, but in any event, what I am trying to get at is in the first part, you have found the man guilty of intentionally and knowingly killing a police officer, correct, if you find him guilty?

"A. Correct.

"Q. In the second part, the punishment stage, you have to answer the first question. What I am trying to get at is, would you automatically answer that first question yes just because you already have found him guilty of intentionally and knowingly killing a police officer?

"A. No.

"Q. Why is that? Again, I am trying to get at how you arrived at your position, and I know it's been a long day.

"THE COURT: Mr. Bax, do you have an objection?

"MR. BAX: Judge, I believe he has answered the question, whether he would automatically answer it yes, which is the qualification question, and he goes into the thought process, and we are spinning his wheels here.

"THE COURT: I think I agree with that. I sustain the objection."

■ We find that the trial court did not abuse its discretion in limiting appellant's voir dire of Matthews. This Court on several occasions has found no abuse of discre-

tion when a trial judge limits a defendant's questioning of a prospective juror as to his understanding of the meaning of the term "deliberately" as used in the first special issue. *Milton v. State*, 599 S.W.2d 824 (Tex.Cr.App.1980); *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr.App.1980); *Chambers v. State*, 568 S.W.2d 313 (Tex.Cr.App.1978). Furthermore, we note that from what questioning had already been allowed to both the State and the defense, appellant could glean that the venireman considered "deliberately" to have a different meaning than "intentionally." Thus, even assuming that appellant had an absolute right to question the venireman regarding his definition of "deliberately," the trial court did not abuse its discretion. This point of error is overruled.

In his last point of error pertaining to the limitation of voir dire, appellant directs us to the voir dire examination of Doris Lewis Zadroga. According to appellant his voir dire examination of Zadroga was improperly restricted when the following occurred:

> "Q. In a hypothetical example—we talked about Joe and I walking into a Seven–Eleven and I've got a .45 and he's got a .45, let's say, and he killed the cashier and I just ran out. I haven't aided, encouraged, or abetted in any way. It's Joe's little robbery, and I am being tried for robbery now—robbery-murder. Based upon the limited facts, do you think that I should be found guilty?
> "MR. BAX: Judge, that is not—I am objecting to the form of that question. Of course, the witness would have to judge the credibility of the person saying, 'I didn't have anything to do with it,' and it is asking too much of the juror.
> "THE COURT: On that basis, I will sustain the objection."

As can be said the prosecution was objecting to the form of the question and it was on that particular basis that the State's objection was sustained. The trial court never instructed appellant's counsel that he would prohibit him from posing a properly formed question based on the hypothetical. Conceivably counsel could have asked the question, noting that eyewitness testimony verified the fact that although both actors had guns, only one participated in the shooting of the cashier while the other actor ran out of the building. After the objection was sustained, counsel never attempted to rephrase his question. Therefore, we are unable to say that his voir dire examination was improperly restricted.

Furthermore, a review of counsel's earlier examination of Zadroga shows that he was allowed to question her along these same lines:

> "Q. Let me give you a hypothetical example. I don't mean to confuse you or anything, but let's say Mr. Hernandez and I go to a Seven–Eleven and let's say we both have guns and I go in there to buy a loaf of bread. While I am buying the loaf of bread standing next to Mr. Hernandez, he pulls out a gun and kills the cashier and takes the money. I look around to see what is going on and I get scared and I run out with Mr. Hernandez. Do you feel in your own mind that I have committed any—broken any kind of law?
> "A. Yes.
> "Q. How do you figure that?
> "A. It's illegal to carry a weapon into a place like that.
> "Q. Besides that, do you feel like I would be guilty of a capital murder in a robbery-murder situation?
> "A. Capital murder? No. You didn't pull the trigger. Right?
> "Q. No, I just saw what happened and I ran out.
> "A. Doesn't the—I don't know that much about the law, but doesn't the law say if you are involved—
> "Q. Aid, abet, assist.
> "A. Okay. Like I said, I don't know that much about it, but I was under the impression if anyone was killed during a whatever, that they were all equally responsible.
> "Q. Even if I didn't know what was going on?

"A. Why would you have a gun if you didn't know what was going on? I don't know.

"Q. I just carried one for some reason. I just carried a gun and I go in there and buy a loaf of bread, and Joe over here just starts shooting away and I look at him and I get scared and I start running out of the store with my loaf of bread and I pay for it. Do you feel I would be guilty of something besides carrying a gun in a liquor-licensed premise, assuming it is a liquor-licensed premise?

"A. I would have to know more about it. I am sorry. That is the best I can do."

As shown above, Zadroga clearly stated that in order to answer the ultimate question concerning her views on the law of parties, she would have to be given more information. When counsel restated the hypothetical, to which the State's objection was sustained, he added no new facts or explication which would in any way help Zadroga clarify her views on the law of parties. After the State's objection was sustained as to the question's form, no other attempt was made to question Zadroga along these lines. Based on the record before us, we are unable to say that the trial court impermissibly restricted appellant's voir dire. Appellant's eighth point of error is overruled.

As stated earlier in this opinion, during the trial ten year old Jose Armijo, Jr. testified that he saw appellant shoot Officer Harris and then shoot his father. During direct examination, Jose, Jr. admitted that when he attended a lineup the night of the shooting, he saw appellant in the lineup. However, because he was afraid that appellant might hurt him, he lied to the police and told them he could not identify anyone. On cross-examination, Jose Jr. testified that when he gave a written statement shortly after the murders, he told the officers that he did not know what the killers looked like because he had not seen them very well. Defense counsel also questioned Jose, Jr. about his failure to identify appellant at the lineup. Finally counsel

questioned Jose, Jr. about the fact that he had talked to both the prosecutors and the police in preparation for his trial testimony. Defense counsel concluded his cross-examination with the following:

"Q. So after you have talked to these people, you have changed your complete version of the facts and they are completely different from what you told the police back on the night of the incident; isn't that correct?

"A. Yes."

On redirect the State established that the police told Jose, Jr. to tell the truth when he was testifying. When the prosecutor asked Jose, Jr. if he was afraid to testify and tell the court what really happened, Jose, Jr. answered affirmatively.

Thereafter Sgt. Edward Cavazos was called to the stand by the State. Cavazos testified that at the request of the prosecutors, he talked to Jose, Jr. Cavazos testified that Jose, Jr. was very nervous and asked if there would be police officers present in the courtroom. Cavazos was then asked if Jose, Jr. told him why he was afraid to come into the courtroom. Over appellant's objections of hearsay and bolstering, Cavazos was allowed to answer and the following occurred:

"A. ... He asked if the suspect was going to be in the courtroom.

"Q. And what did you tell him?

"A. I told him that he was.

"Q. And what assurances, if any, did you give him concerning the suspect being the courtroom, being there testifying before the jury.

"A. I stated I would be outside the courtroom, and also that it (sic) would be other officers in the courtroom.

"Q. And throughout this conversation that you had with Jose, again at any time, did you try to talk him into identifying anyone in the courtroom as the person?

"A. No, sir."

Appellant now argues in his ninth point of error that it was error for the trial court to permit Sgt. Cavazos to bolster Jose, Jr.'s testimony about his fear of appellant when

that testimony had not been impeached on cross-examination.

We disagree. "Bolstering" occurs when one item of evidence is improperly used by a party to add credence or weight to some earlier *unimpeached* piece of evidence offered by the same party. *McKay v. State*, 707 S.W.2d 23 (Tex.Cr. App.1985). Clearly, appellant's cross-examination of Jose, Jr. was an attempt to impeach the rationale he gave on direct examination for the discrepancy in his failure to identify appellant immediately after the incident and his identification of appellant at trial. The whole point of appellant's cross-examination of Jose, Jr. was to show that the boy was changing his story about identifying the murderer, not because he had been afraid of appellant at the time of the taking of his sworn statement and the lineup, but because the prosecutors and the police had persuaded him to testify falsely at trial. This impeachment by appellant which suggested recent fabrication permitted corroboration of Jose, Jr.'s testimony by Cavazos. *Williams v. State*, 607 S.W.2d 577 (Tex.Cr.App.1980). This point of error is overruled.

In his tenth point of error, appellant argues that the testimony of Sgt. Cavazos was hearsay and should not have been admitted.

"... 'Hearsay' is defined as an out of court statement offered for the truth of the matter asserted. *Phenix v. State*, 488 S.W.2d 759 (Tex.Cr.App.1972), at 761 citing McCormick, J., *Evidence*, Sec. 225 at 460; and *Salas v. State*, 403 S.W.2d 440 (Tex.Cr.App.1966).

"An out of court statement offered for the purpose of showing what was said rather than the truth of the matter stated therein does not, however, constitute hearsay. *Porter v. State*, 623 S.W.2d 374 (Tex.Cr.App.1981), *cert denied*, 456 U.S. 965, 102 S.Ct. 2046, 72 L.Ed.2d 491 (1982). See also *Nixon v. State*, 587 S.W.2d 709 (Tex.Cr.App.1979); *Gholson v. State*, 542 S.W.2d 395 (Tex.Cr.App. 1976), *cert. denied*, 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084 (1977)." 707 S.W.2d at 33.

Clearly in the instant case, the questioning of Cavazos was not directed toward proving the truth of what Jose, Jr. was asking Cavazos; rather the questioning was directed to establishing that Jose, Jr. had in fact asked those questions of Cavazos. Thus, Cavazos testimony was not hearsay and thus was admissible.

Immediately after Sgt. Cavazos finished testifying, the State called Marie Estelle Armijo, mother of Jose Armijo, Jr. to the stand. Appellant objected strenuously on the grounds that calling Mrs. Armijo would violate "The Rule," Article 36.05, V.A.C. C.P., in that she had been in attendance during most of the trial. The State responded that they had not realized the necessity of calling her as a witness until the defense attempted to impeach the identification of appellant by Jose, Jr. The State further argued that they were calling Mrs. Armijo for the specific purpose of showing prior consistent statements by Jose, Jr. to rebut the recent fabrication allegations made by the defense. The trial court overruled appellant's objection and Mrs. Armijo was allowed to testify. She testified that immediately after the murders, while she went to the hospital with her husband, Jose, Jr. was taken down to the police station to give a statement and view a lineup. When he returned home, Jose, Jr. told her that he knew who had done the shooting and he had seen the man in the lineup. However because he was afraid of the man, he had not told the police.

In the recent case of *Archer v. State*, 703 S.W.2d 664 (Tex.Cr.App.1986), this Court set out the law applicable to situations where the rule has been violated:

"... [A] violation of the rule is not itself reversible error. *Hass* [*v. State*, 498 S.W.2d 206 (Tex.Cr.App.1973)]; *Murphy v. State*, 496 S.W.2d 608 (Tex.Cr.App. 1973). A violation of the rule may not be relied upon for reversal of the case unless it is shown that the trial court abused its discretion in allowing the alleged violative testimony to be elicited at trial. The ultimate test for determining when an abuse of discretion has occurred is whether harm to the defendant has

resulted by allowing the violative testimony to be introduced. *Haas,* supra.

"In *Haas,* supra, the Court established two criteria for determining whether the defendant was in fact harmed by the violation of the rule: namely:

(1) Did the witness actually hear the testimony of the other witness, and

(2) Did the witness's testimony contradict the testimony of the witness he actually heard.

"In the instant case, neither *Haas* criteria was met; however, in order to give full effect to Art. 36.03 and the related instruction required by Art. 36.06, these criteria must be expanded to embrace other situations in which the rule has been violated. *Haas,* supra, was correct but the analysis was limited to the situation where a witness hears testimony from the opposition and later takes the stand and contradicts that testimony he actually heard.

"The first *Haas* criteria is too narrow to give full effect to Art. 36.03 and Art. 36.06. A clear reading of these articles makes it evident that not only are witnesses to avoid hearing others' testimony, they are also not to confer among themselves without court permission. Thus, the first *Haas* criteria should be expanded to include a determination of whether the witnesses have conferred. The better question is, did the witness actually hear the testimony or confer with another witness without court permission.

"The second criteria is likewise too restrictive. In the situation where two or more witnesses testifying for the same side in a criminal case have violated the rule, it makes no sense to say that their testimony must conflict in order to show harm. Of course, in most cases the opposite will occur. When two State or defense witnesses confer outside the courtroom on a matter pertinent to the case their testimony is likely to coincide, not conflict. See *Hougham v. State,* 659 S.W.2d 410 (Tex.Cr.App.1983), where Judge Clinton, in a concurring opinion, suggested an alternative to this second

*Haas* criteria to encompass this situation." 703 S.W.2d at 666–667.

■ Of course our opinion in *Archer* was correct. However, we are of the opinion that the test in *Archer* must be further expanded. Thus, we now adopt the suggestion of Judge Clinton made in his concurring opinion in *Hougham v. State,* supra. That is, in situations in which the objectionable witness has heard testimony of one or more witnesses prior to his own testimony, the second prong of the *Haas* test should be expanded to read as follows:

Did the witness's testimony contradict the testimony of a witness he actually heard from the opposing side or corroborate the testimony of another witness he actually heard from the same side on an issue of fact bearing upon the issue of guilt or innocence?

If so, consequential injury or prejudice will flow from that objectionable testimony. That does not end the inquiry however.

In *Green v. State,* 682 S.W.2d 271 (Tex. Cr.App.1984), a capital murder case, the State attempted to connect Green with the offense by virtue of the fact that witnesses testified that one of the actors had spoken with a lisp. During defense testimony, Green's sole witness testified that Green had never had a speech impediment. At that point the State realized that it needed to call witnesses to rebut that assertion. One of the witnesses called by the State in rebuttal was a woman named Peggy Stevens who had been watching the entire trial and had heard Green speak in the courtroom. Over defense objections that her testimony violated "The Rule," Stevens was allowed to testify that she had heard Green speak and that he spoke with some sort of a speech impediment. On appeal, this Court wrote the following:

"Enforcement of 'the rule' is within the discretion of the trial court. *Cooper v. State,* 578 S.W.2d 401 (Tex.Cr.App. 1979). The court's decision will not be reversed unless an abuse of discretion is shown. *Brown v. State,* 523 S.W.2d 238 (Tex.Cr.App.1975). Violations of 'the rule' fall into two main categories: witnesses who have been sworn or listed as

witnesses in the case and either hear testimony or discuss another's testimony; and persons like Stevens, who were not intended to be witnesses and are not connected with the case in chief but who have, due to events during trial, become necessary witnesses. Stevens was apparently not connected with the case in any way and simply heard appellant speak. No abuse of discretion is shown." *Green v. State*, 682 S.W.2d at 271.

Thus, a two-step approach must be taken when initially answering the question of whether a trial judge has abused his discretion in allowing a violation of "The Rule." The appellate court must first determine what kind of witness was involved.

■ If the witness was one who had no connection with either the State's case-in-chief or the defendant's case-in-chief and who, because of a lack of personal knowledge regarding the offense, was not likely to be called as a witness, no abuse of discretion can be shown. On the other hand, if the witness was one who had personal knowledge of the offense and who the party clearly anticipated calling to the stand, then the appellate court should then apply the *Haas* test as amended above and in *Archer*.

■ In the instant case, Mrs. Armijo had no personal knowledge of the offense. Although her husband and children were directly involved, she was not present during the commission of the offense and thus could shed no light on appellant's involvement. Only after her son's identification of appellant was impeached by a prior inconsistent statement was it necessary for the State to put Mrs. Armijo on the stand. Consequently, we find her to be the same type of witness as Peggy Stevens in *Green v. State*, supra. Although not intended to be a witness, because of events which occurred during trial, Mrs. Armijo became a necessary witness. Based on the record before us, we are unable to say that the trial court abused its discretion in allowing Mrs. Armijo to testify. Appellant's eleventh point of error is overruled.

■ In his twelfth and thirteen points of error, appellant contends that the admission of Mrs. Armijo's testimony was error in that the testimony was inadmissible hearsay and improper bolstering. Prior to the admission into evidence of the testimony a hearing was held out of the presence of the jury at which time the State argued that the testimony was being offered to rebut the insinuation raised during cross examination of Jose, Jr. that his explanation for not identifying appellant at the police lineup was a story concocted by the prosecutors and the police. The State contended, and we think correctly, that the boy's prior consistent statement—that he told his mother the day after the murders that he had seen the killer in the lineup but was afraid to identify him to police—was admissible as rebuttal to the defense suggestion that Jose Jr.'s story was recently fabricated. *Williams v. State*, supra. It has long been the rule that where an attempt is made to impeach a witness by showing he made statements inconsistent with his trial testimony, he may be supported by showing that he made statements consistent with his trial testimony after the offense in question. *Duncantell v. State*, 563 S.W.2d 252 (Tex.Cr.App.1978). Mrs. Armijo's testimony was not improper bolstering. Rather it served to rehabilitate the testimony of her son after the attack by the defense.

Nor do we find that the testimony was inadmissible hearsay. Clearly, Mrs. Armijo's testimony was not offered to prove the truth of the fact asserted therein. Rather, it was admitted to show that Jose, Jr. had indeed made a prior consistent statement. For these reasons, we overrule appellant's twelfth and fourteenth points of error.

Having found no reversible error, we affirm the judgment of the trial court.

ONION, P.J., and MILLER, J., concur.

CLINTON, Judge, dissenting.

Among appellant's eighteen grounds of error are three grounds of error attacking the trial court's decision to allow the witness, Marie Estel Armijo, briefly to testify

over repeated and strenuous objections that her testimony (1) constituted inadmissible hearsay, (2) bolstered the testimony of her son, Jose Armijo, Jr., and (3) was admitted in violation of the rule, Article 36.03, V.A.C.C.P. While I am satisfied that the first two of these contentions present no error, I am deeply troubled by the third, and believe that it amounts to an abuse of the trial court's discretionary authority to enforce the rule. Article 36.04, V.A.C.C.P.[1] To fully address the gravity of the problem it is necessary to set out: first, the undisputed evidence; second, the testimony of the various "eyewitnesses" to the killing; third, the testimony of Jose Armijo, Jr., son of Marie Armijo; and finally, the testimony of Marie Armijo herself.

## I.

### A.

The following events were established at trial beyond peradventure:

Houston Police Officer James Harris was on "K–9" patrol, his only partner a police dog, on the evening of July 13, 1982, in what was described as a lower middle class Mexican–American neighborhood in Houston. At approximately 10:00 p.m. Harris spoke to a pedestrian, George Brown, who informed him that a black "Cutlass" had only moments before attempted to run over Brown, forcing him into a ditch. Other witnesses had seen this car "driving fast ... spinning tires, burning rubber." Harris gave pursuit.

Less than a minute later Harris came upon a black Buick with red vinyl top stalled at the intersection of Edgewood and Walker. Harris stepped out of his vehicle, leaving the door open, and beckoned to the occupants of the Buick. Appellant, who was the driver, and his companion, Roberto Flores, approached Harris. One of the two then shot Harris three times, the bullets entering the left side of his face and exiting on the right. Three spent nine millimeter cartridges were subsequently found be-

side Harris' vehicle, and three bullets fired from a Browning nine millimeter pistol were recovered from a house in the direction in which the slugs that killed Harris would have traveled. The shots proved fatal. Appellant and Flores then fled on foot in an easterly direction down Walker.

At this time Jose Armijo and his two children, Jose, Jr., and Lupita, were driving west on Walker. From the passenger side of the car, on the north side of Walker, came a shot from a Browning nine millimeter pistol that killed Armijo, Sr. Two nine millimeter cartridges were found on the north side of the street. Also found, on the south side of Walker, were two cartridges from a .45 caliber pistol.

Approximately an hour later Flores died in a shootout with Houston police, during which an officer was also seriously wounded. The shootout occurred outside the residence next door to which appellant had been living, several blocks from the scene of Harris' killing. Under Flores' body was found a Browning nine millimeter pistol, which he had used in the gun battle with police. It was positively shown this was the weapon that killed Armijo, Sr.; and it is also reasonable to believe, although it could not be proved definitively, that this gun killed Harris. Also found on Flores were a magazine containing 20 nine millimeter rounds, and Harris' service revolver. Police found appellant at the same location, crouching behind a horse trailer. The .45 caliber pistol which had been fired earlier was discovered wrapped in a bandana under the trailer, two feet from where appellant was found.

### B.

The sole contested issue at trial was whether Flores, rather than appellant, shot Officer Harris. The State produced five witnesses, including Jose Armijo, Jr., who "saw" the shooting and testified that appellant was the perpetrator. Appellant and two other eyewitnesses testified, in essence, that Flores actually shot Harris.

---

**1.** Effective September 1, 1986, these provisions were repealed. See now Tex.R.Cr.Evid., Rule

613. Appellant was tried in 1982.

The State's own witnesses contradicted one another as to which man had run down the north side, which the south, of Walker—a critical question, since whoever fled down the north side shot Armijo with the same weapon used to kill Harris. No witness went unimpeached. Thus we apparently have, in addition to the undisputed testimony as set out in Part A, *ante*, nothing more than a classic "swearing match." Nonetheless, for reasons to be developed, I believe that the testimony of Jose Armijo, Jr., was critical to the State's case. I turn first to examination of the testimony of the State's other eyewitnesses.

Patricia Diaz was in a car coming east on Walker Street when she encountered the Buick blocking the intersection, between her vehicle and Harris'. She heard someone she later assumed was Harris yelling "stop, stop," and saw appellant "standing by his car turned sideways pointing" in the direction of the police car. Diaz demonstrated "how he was pointing," but she could not make out what, if anything, was in appellant's hand. She testified she saw no one else around. She ducked and then heard shots. On crossexamination she stated: "I didn't see him fire. I just saw the way he was standing. That was it." Later she admitted, "I didn't exactly know who shot who."

Herlinda Garcia was fifteen years old at trial. She testified that she was standing with her sister at some point at the intersection of Edgewood and Walker[2] and observed two men get out of a Buick. Appellant, the driver, approached Garcia saying, "something about a boost, something about their car being messed up." Harris then pulled up, "put his headlights on [appellant, and] said 'Hold it.'" The two men got out of the car and approached Harris. She testified that she saw appellant "turn toward the policeman" and pull what "looked like" a gun from his pants. She then *heard* three shots, and, seeing Harris go down, she ran. She seemed to indicate, though the record is murky on this point,

that appellant then fled down the *north* side of Walker. She concluded her direct examination by affirming the prosecutor's leading question whether she was certain appellant was the man she "saw" shoot Harris.

On crossexamination the following colloquy ensued:

"A: He pulled something out of his pants.

Q: Did you see what it was?

A: No.

Q: When he pulled that something out of his pants, what did you do?

A: That is when we just ran. I heard gunshots somewhere.

Q: When you heard the gunshots, did you see the officer at all?

A: No.

Q: Did you see the gunshots?

A: No. I told you I was running at the time of the gunshots.

Q: Well, did you see this man here, the [appellant]? Did you see him fire at the police officer?

A: Yes.

Q: You did?
   With what?

A: I didn't see with what. He was going towards the policeman.

Q: Okay.

A: And the other one I didn't see.
   He was going towards the policeman, and that is when I heard gunshots and that is when I ran.

Q: You are not telling this jury you saw the [appellant] shoot the police officer?

A: Yes.

Q: With something he had in his hands?

A: What else could it have been, if not gunshots?

Q: Did you see the fire come out of the barrel?

A: No, I didn't.

Q: Because when you saw this, you ran, right?

---

2. Deplorably, the record is riddled with instances of witness identification of persons and places which, though they must have been clear to all present at trial, cannot be ascertained from the cold record—instances of unspecified pointing, of identifying "him" with no indication of to whom "him" refers.

A: Uh-huh."

Asked on redirect why she was telling the jury that "this is the man who shot the police officer," she replied "Because that is who I saw." On recross she again insisted that she never saw Flores. Finally, in apparent exasperation she concluded:

"A. I am trying to explain. In the car there was two men. I didn't see the other one. I didn't pay any attention to him. He just got out of the car. I didn't see him."

Next to testify was Garcia's sixteen year old sister, Vera Flores. According to Vera, she was standing at the intersection with her sister when the Buick stopped, appellant got out and asked them for "cables to get him a boost." She testified that appellant was the "only one [she] was paying any attention to." After about a minute and a half Harris arrived and said, "Stop." Harris stood by the open driver's door of his vehicle as the two men approached. Some unidentified person said, "no, no," and Vera heard three gunshots, but did not see a gun. Then:

"Q: Okay. Could you tell who had fired those shots from where you were at, which one of the three men had fired those shots you heard?

A: Yes, sir.

Q: Which one was it of the three men who fired those shots?

A: The driver in the black car.[3]

Q: Okay. Could you see the pistol at all from where you were at—

A: No, sir.

Q: —or the type of gun?

A: No, sir.

Q: When you say it was the driver who fired those shots, how do you know it was the driver who fired those shots?

A: Because when he started running, I just seen him shooting down the street."

On crossexamination Vera could not describe the activities of the "other one" except to say that he stood next to the police car with his hands on the hood, closer to Harris than was appellant. Like Garcia,

3. Vera later identified appellant as the driver.

she insisted that she "wasn't really bothering with the other one:"

"Q: And the passenger, where did he—

A: No. I didn't see him.

What I am trying to say, I saw both of them. I did, but I was not paying attention to him. I was paying attention to the driver.

Q: But you said you saw both of them put their hands on the police car hood?

A: I did."

She then testified that after the shooting appellant ran down the *south* side of Walker, firing his weapon.

On redirect the prosecutor reminded Vera that on July 14, in the early morning after the murder, she told police she "saw" appellant pull a pistol from his pants and shoot Harris. Asked if indeed that was what she "saw," Vera answered "yes," and confirmed that she was sure. But on recross she stated: "I seen his hands, and then that is all I seen." Asked again if she had seen appellant shoot Harris, she replied: "Did I see him? I don't remember."

Hilma Galvan testified that she had seen appellant before as a customer in a convenience store where she worked, located in the neighborhood. Galvan was standing on the north side of Walker in front of her house, which was apparently the second or third house down from the intersection, and "maybe fifty feet" from the corner. Her testimony places witnesses Flores and Garcia in front of the Buick, on the south side of Walker. She saw appellant "yelling" at the sisters. From his open car door, Harris ordered appellant to "come here," and when appellant instead began to walk away, Harris told him, "Hey, you come back." Appellant then turned and approached Harris. Galvan repeatedly insisted she saw nobody else. She testified:

"Q: Did you actually see this man who was walking towards the police officer shoot at the police officer?

A: I did.

Q: Okay. Could you tell from your position there by your house what type of gun it was the man had?

A: No, sir. I never seen the gun.

Q: You don't know anything about guns anyway, do you?

A: No. Not that much.

Q: But this man who shot the police officer, did you see some type of gun or pistol in his hand?

A: Yes, I seen the—like, you know—

Q: The flash?

A: Yes, I seen the flash coming out, and it sounded real loud."

On crossexamination Galvan was shown a pretrial statement in which she had said Harris "pushed" appellant up against the police car. Galvan agreed that Harris was "touching" appellant, and stated that "[t]he shots were fired right there and then." Still she saw nobody else. Next:

"Q: So then the shooting started?

A: Yes.

Q: And what transpired in that immediate second that you saw if you can remember?

A: If I can remember?
I heard the shots. I seen the officer fall, and I seen the man running towards us, shooting.

Q: Let me stop you right there.
You heard the shots?

A: Yes.

Q: You didn't see the shots?

A: I seen the man that was right in front of him, and a flash was coming out of his gun.

Q: You saw the flash?

A: Yes."

Appellant then ran down Galvan's side of the street, which was the *north* side. Galvan insisted that she never saw Roberto Flores that night, although she admitted she "had seen him before."

When the State rested, appellant put two teenage boys on the stand who viewed the incident from the same vantage as had Galvan. Jacinto Vega testified:

"Q: What did the driver—after he talked to Herlinda and Elvera, the driver, what did the driver do?

A: After that, the cop was behind the black car and called the driver.

Q: And did the driver come over?

A: He did.

Q: And what did he do?

A: He put his hands over the hood.

Q: And the passenger, what was he doing?

A: He was coming behind the driver.

Q: And did you see the passenger do anything unusual?

A: Yes. He was—the police told him something, and he came over to the police, and after that, he was in the back of the driver, and he took something out and he shoot him.

Q: The passenger, right?

A: The passenger."

Vega did not know who the passenger was. He explained the fact that he had identified appellant at the July 14 police lineup in that the police had simply asked him whether he recognized anyone, not whether anyone in the lineup shot Harris.

Jose Heredia testified substantially as did Vega. In addition, he identified the passenger as "Werro," which was shown to be a name by which Flores had been known. Heredia insisted that Flores shot Harris. Both Vega and Heredia admitted being at least acquaintances of appellant.

Finally, appellant testified in his own behalf, through an interpreter, and asserted that the nine millimeter pistol belonged to Flores. According to appellant, he and Flores had both talked to the two sisters about cables. They then returned to the Buick and attempted to start it. Harris arrived and told them to "come on." Appellant put his hands on the hood of the police car and spread his legs, as he thought Harris was instructing him to do. Harris' gun was drawn, and he was telling Flores also to "come on." Appellant was concentrating on Harris' gun when he heard shots in his ear. Flores then took Harris' fallen gun, and both men fled, appellant down the south side of Walker, drawing his .45 caliber pistol for the first time and firing "upwards." He testified he did not know what side of the street Flores ran down.

Were this the only evidence in the case, I would be inclined to hold the evidence in-

sufficient to find appellant guilty of murdering Officer Harris. This is because, to my mind at least, the testimony of the State's witnesses, as set out *ante*, does not exclude the reasonable hypothesis that Flores killed Harris; or, to put it another way, though such testimony does not necessarily support the inference that Flores did, neither does it eliminate that possibility beyond a reasonable doubt. See, e.g., *Carlsen v. State*, 654 S.W.2d 444 (Tex.Cr. App.1983). While I realize that the present case does not *appear* to be based on circumstantial evidence, still, as *Carlsen*, supra, makes clear, the appellate *standard* for determining sufficiency is the same, *viz:* "whether, after viewing [all of] the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1974).

Though all of the State's eyewitnesses, except Diaz, testified that appellant killed Harris, on crossexamination it was revealed that this was a conclusion on the part of each, not necessarily borne out by her particular perceptions of the event. Garcia saw what "looked like" a gun, pulled from appellant's pants, and then she "heard" shots—she herself was running by this time. She definitely "saw" appellant, but seems to have assumed he fired the fatal shots—not a necessarily unreasonable assumption on her part, since she "didn't see" Flores there; but not a particularly reliable one either. Vera Flores also "heard" gunshots but saw no gun. She concluded that appellant fired the shots simply because he subsequently fled, discharging his gun. But the evidence shows unequivocally that both men had guns, and appellant's discharge of his weapon as he fled does not prove he fired the first fatal shots, or even that he ever drew on Harris. Galvan saw appellant approach Harris, saw Harris touch appellant in some manner, "heard" and saw the flash of a gun, and

then saw appellant come in her direction. She did not see a gun in appellant's hand. The most remarkable aspect of these witnesses' testimony is that when the killing occurred none had any idea what Flores was doing or even where he was. They simply "did not see him"—indeed, Galvan *never* saw him.

None of this removes the reasonable hypothesis, advanced by appellant's defensive testimony, that as appellant approached the police car, Flores came between the two cars, positioned himself beside and behind appellant, just to Harris' left, and shot Harris. This theory comports with the physical evidence, as reviewed *ante*. Furthermore, it is utterly inconceivable to me that in the time between the killing of Harris and the subsequent gun battle with police, when the murder weapon was discovered on Flores' person, appellant and Flores would have traded weapons!

The trial court gave no charge authorizing the jury to convict appellant as a party to Harris' murder. Thus, in order to convict appellant of murder it was necessary that the jury find beyond a reasonable doubt that appellant himself shot Harris. Absent the testimony of Jose Armijo, Jr., to which I turn next, I am most doubtful any rational jury could have so found.[4]

### C.

Armijo, Jr., ten years old at the time of trial, testified before any of the State's other eyewitnesses. Thus he gave the jury its initial impression of the events surrounding the actual shooting of Officer Harris.

Armijo testified that he was coming home from the auto parts store with his father and sister when they noticed "the black car" and Harris' vehicle blocking the intersection ahead. Armijo saw two men with their hands on the hood of the patrol car.

"Q: What did you see?

A: The other one scratched his back.

---

4. In fact, even *with* Armijo's testimony I *personally* have substantial doubt that appellant was the triggerman here. Of course I recognize this Court has no authority to pass upon the weight

and preponderance of the evidence. *Combs v. State*, 643 S.W.2d 709 (Tex.Cr.App.1982); *Gold v. State*, 736 S.W.2d 685, 690 (Tex.Cr.App.1987).

Q: Which one scratched his back?

A: The one that has long hair.

Q: All right. Was the man that had the long hair closer to the police officer when he had his hands on the hood or was he the one farther away from the police officer?

A: Closer.

Q: And what did you see that man do?

A: He shot the police.

Q: Before he shot the police officer, did you see him do anything with his hands?

A: Yes. He acted like he was scratching his back.

Q: When you said—he took his hands from off the police car and acted like he was scratching his back?

A: Yes.

Q: After he did that, what happened then?

A: He took out the gun and shot the police.

Q: Do you know how many times he shot the policeman?

A: No.

     \*       \*       \*       \*       \*       \*

Q: Did you see any fire coming from the gun when he shot the police officer?

A: Yes.

Q: What did you see happen to the policeman after he was shot?

A: He fell down on the ground.

Q: Do you remember what the man was wearing that was standing closer to the police officer, that scratched his back?

A: Yes.

Q: And came out with a gun?

A: Yes.

Q: What was he wearing?

A: A green shirt."

When found, appellant was wearing a green shirt; and indeed, Armijo apparently identified appellant in court as the man who shot Harris; but see n. 2, *ante.* One of the men, Armijo did not know which, then took Harris' gun and "[t]hey started running and shooting all over the place." "The one with the green shirt" ran by the car and shot into it, killing Armijo, Sr.

The State then elicited, still on direct, that at the police lineup early the next morning, Armijo, Jr., told police he could identify no one, but that this had been "a lie." Armijo explained that he had not identified appellant because, as he said, "I was scared he might come out and get me."

On crossexamination Armijo's perceptions of the shooting itself were not tested. Instead defense counsel focused on a statement the boy had given police the night of the shooting in which he had said he did not know what the two men looked like nor what they had worn. Armijo admitted that at the lineup he had been told that the one way mirror would prevent those in the lineup from seeing him. It was further established that, once he heard the first shots, Armijo pushed his sister to the floorboard of the car where they remained until the two men had run well past them.

Then, the following occurred, and with it were engendered appellant's three grounds of error at issue here:

"Q: Has anybody talked to you about this case?

A: Yes.

Q: The Prosecution, the prosecutors, Mr. Bax and Mr. Moen?

A: Yes.

Q: Have the police talked to you?

A: Yes.

Q: Yesterday?

A: Yes.

Q: Did they talk to you any other times?

A: Yes.

Q: Did they talk to you on Saturday?

A: Yes.

Q: Did they talk to you today?

A: Yes.

Q: Who talked to you?

A: I forgot his name.

Q: Mr. Bax?

A: Yes.

Q: And Mr. Moen?

A: Yes.

Q: Any police officers talk to you?

A: Yes.

Q: So after you have talked to these people, you have changed your complete version of the facts and they are completely different from what you told the police back on the night of the incident; isn't that correct?

A: Yes."

At this time there was an outburst "from a woman in the back of the courtroom," later shown to be Marie Armijo, Jose Armijo, Jr.'s, mother. She was escorted out by the bailiff, not to return until she herself testified toward the end of the State's case in chief. Thus she did not hear the bulk of the State's eyewitness testimony. But, though she spoke no English, she did hear her son's testimony, translated to her by her sister-in-law.

### D.

After a hearing, and over repeated objections by appellant on the grounds now raised on appeal, Marie Armijo was allowed briefly to take the witness stand and testify through an interpreter. She testified that on the night of the shooting she had gone to the hospital where her husband had been taken, while Jose, Jr., went to the police station to give a statement. She did not see Jose again until 8:30 the following morning. At this time he cryingly told her:

"... that he had seen the person that had done it and he was able to identify the person, but he was very much afraid to tell the police about that and didn't think he should tell them."

Further, she testified that since his father's death, Jose, Jr., had not been the same carefree child as before, and that "[h]e was afraid of the person that had shot his father." It was established that on the Saturday prior to her testifying, Marie Armijo had informed prosecutors that her son could identify the killer. Finally she con-

firmed that her son had also been afraid to testify at trial.[5]

On crossexamination it was established that Marie Armijo had made the outburst at the end of her son's testimony, which had been translated for her. Then:

"Q: Have you talked to your son since then?

A: Yes, sir.

Q: Did you talk to your son yesterday?

A: Yes, about he was a witness and what was the truth.

Q: Did he talk about the facts in this case?

A: Yes, sir."

Again objection was made that the witness had been allowed to testify in violation of the rule. The objection was overruled.

On redirect Mrs. Armijo was allowed to explain her previous outburst in the courtroom as follows:

"A: Well, it was because I wanted to make certain that it was the truth, what my son was saying, because he told me that that was the truth."

The witness was then excused.

With the foregoing in mind I proceed to discussion of appellant's grounds of error complaining of Marie Armijo's testimony.

### II.

### A.

The objections to hearsay and bolstering are fairly easily disposed of. Prior to Mrs. Armijo's testimony a short hearing was held out of the presence of the jury. The State argued that Armijo's testimony would be offered to rebut the insinuation raised during crossexamination of Jose, Jr., that his explanation for not identifying appellant at the police lineup, *viz:* that he was afraid, was concocted by prosecutors

---

5. Just before Ms. Armijo's testimony the court allowed Houston Police Officer Edward Cavazos to testify, over objections of bolstering and hearsay, that the day before Jose Armijo, Jr., had testified, he had indicated to Cavazos that he was uneasy about appellant's presence in the courtroom. Cavazos also testified that he in no manner directed Jose as to how he should testify in court. As with Ms. Armijo's testimony, the State argued this was admissible to counter de-

fensive insinuations that Jose's explanation was implausible. It should be noted that Officer Cavazos' testimony does *not*, however, refute any suggestion of recent fabrication, since he did not describe a *prior* consistent statement. See analysis in Part II A, *post*. In fact, Officer Cavazos' testimony may well have served no rehabilitative function whatsoever, merely bolstering Jose's explanation. See *Sledge v. State*, 686 S.W.2d 127 (Tex.Cr.App.1984).

and by the boy himself.[6] The State contended that the boy's prior consistent statement—that he told his mother as early as the next day that he had seen Harris' killer in the lineup but was afraid to identify him to police—was admissible to refute the defensive insinuation that Jose Armijo, Jr.'s explanation for not identifying appellant at the lineup had been recently fabricated. Indeed, the testimony *was* admissible for this purpose, see 1 R. Ray, Texas Law of Evidence Civil and Criminal § 774 (Texas Practice 3rd ed. 1980), and the trial court so ruled.

Appellant seems to have argued to the court that Mrs. Armijo's testimony improperly bolstered her son's incourt identification of appellant, by confirming that Jose really could have identified appellant at the police lineup. They objected that the fact that Jose told his mother *after* the police lineup that he really could identify the killer was not a "prior consistent statement" capable of rehabilitating his statement to police. But that was not the purpose for which the testimony was offered. At no time in her testimony did Mrs. Armijo indicate that Jose told her that *appellant* had been in the lineup or that Jose could identify *him*. The State very scrupulously directed her responses to the fact that Jose had seen the killer in the lineup, without identifying him, but was afraid to tell police at that time. Thus, her testimony did not "bolster" that of her son, but rehabilitated him. See *Sledge v. State*, 686 S.W.2d 127 (Tex.Cr.App.1984); *Pless v. State*, 576 S.W.2d 83 (Tex.Cr.App.1979). Nor, of course, was it hearsay, as it was not admitted to prove the truth of the fact asserted therein, but only to show that Jose had previously made the statement. These grounds of error are therefore correctly overruled.

### B.

Appellant also argued, however, and most vigorously, that admission of Mrs. Armijo's testimony violated the trial court's own order at the beginning of trial that all witnesses be placed under the rule.

Article 36.03, V.A.C.C.P., reads in relevant part:

"At the request of either party, the witnesses on both sides may be sworn and placed in the custody of an officer and removed out of the courtroom to some place where they cannot hear the testimony as delivered by any other witness in the cause. This is termed placing witnesses under the rule."

The purpose of the rule is "to prevent the testimony of one witness from influencing the testimony of another." *Cook v. State*, 30 Tex.App. 607, 18 S.W. 412 (1892). The genesis of the rule is said to lie in the History of Susanna, a book of the Apocrypha:

"The story of Susanna is familiar. Her accusers testified in the presence of each other to her guilt. She was about to be condemned when Daniel interposed, saying: 'Put these two aside, one far from another, and I will examine them.' His examination disclosed such discrepancies in their testimony as resulted in the release of Susanna and the condemnation of her accusers. Since then the importance of the separation of witnesses has been regarded as a valuable adjunct to the cross-examination of witnesses and a right accorded whenever demanded in the trial of causes [citations omitted]."

*Bishop v. State*, 81 Tex.Cr.R. 96, 194 S.W. 389 (1917).

It had long been held under the common law that "[t]he admissibility of witnesses who have violated the rule, or who have not been placed under the rule, is within the sound discretion of the court, and such discretion will be presumed to be correctly exercised until the contrary appears." *Cook v. State*, supra. That holding was essentially codified in art. 645, Vernon's Ann.C.C.P. (1925), now Article 36.04, V.A. C.C.P., which provides, *inter alia*, that

---

**6.** The crossexamination set out at p. 482, *ante*, was obviously intended to invite the jury to infer that Jose, in league with police and prosecutors, had made up the story told on direct examination. This suggestion necessarily includes the insinuation that a few days prior to trial Jose's "explanation" for the prior inconsistent statement was also fabricated.

"[t]he enforcement of the rule is in the discretion of the court," see *Wilson v. State*, 158 Tex.Cr.R. 334, 255 S.W.2d 520 (1953), and was most recently reiterated in *Green v. State*, 682 S.W.2d 271 (Tex.Cr. App.1984).

The trial court abuses its discretion when its refusal to enforce the rule works to the injury or prejudice of the accused. *Hougham v. State*, 659 S.W.2d 410 (Tex.Cr.App. 1983); *Haas v. State*, 498 S.W.2d 206 (Tex. Cr.App.1973); *Murphy v. State*, 496 S.W.2d 608 (Tex.Cr.App.1973). Relevant criteria for determining injury are (1) whether the witness actually heard, *either* (2) a defense witness whom he then contradicts, *or* (3) a prosecution witness whose testimony he subsequently corroborates, (4) on an issue of fact bearing upon guilt or innocence. *Hougham v. State*, supra (Clinton, J., concurring); *Day v. State*, 451 S.W.2d 508 (Tex.Cr.App.1970); *Wilson v. State*, supra. *Archer v. State*, 703 S.W.2d 664 (Tex.Cr.App.1986).

The record clearly indicates that Mrs. Armijo actually heard the testimony of her son. Though that testimony had to be translated to her, her outburst and explanation for it indicate that she well understood the testimony which she subsequently corroborated. Furthermore, during the interim between her son's testimony and her own, they discussed the facts and "what was the truth." Thus the only impediment to a finding of abuse of discretion on the part of the trial court in allowing Mrs. Armijo's corroborating testimony is a determination whether what she corroborated was "an issue of fact bearing upon guilt or innocence." It is to this end that I have so painstakingly set out, in Part I of this opinion, the evidence upon which the jury relied to find appellant, not Roberto Flores, killed Officer Harris.

Jose Armijo, Jr., was the only State's witness who saw both appellant and Flores and could testify unambiguously that appellant perpetrated the shooting. His were the only perceptions that went unimpeached. To my mind his testimony is all that stands between appellant and an acquittal for insufficient evidence. See Part IB, *ante*.

The critical factor for the jury in assessing Jose's testimony, in view of his prior inconsistent statements to police, was his credibility as a witness. In anticipation of this, and to soften its inevitable effect upon the jury, the State elicited the prior statement, along with an explanation, during Jose's direct testimony. A great deal depended upon the plausibility of the explanation, and a blow to that could prove critical. Thus, though Marie Armijo did not testify to facts bearing *directly* upon determination of appellant's guilt or innocence, her testimony directly impacted the credibility of the witness whose testimony *most* bore upon appellant's guilt or innocence. Having heard her son's testimony, she was in an ideal position to know precisely how to testify in order to rehabilitate him. It seems to me there is a considerable likelihood her testimony affected the jury's verdict—indeed, it may have sealed the finding of guilt in a case otherwise rife with doubt.

The majority finds the situation in *Green v. State*, supra, analogous to that here, and thus concludes there has been—indeed, there "can be"—no abuse of discretion shown. To my mind *Green* is easily distinguishable. There the witness Stevens had been in attendance the entire trial and had overheard Green speaking informally in the courtroom. Thus she was in a position to dispute defense testimony that Green did not have a speech impediment, which was a critical issue in the case. However, Stevens "was apparently not connected with the case in any way and simply heard [the defendant] speak." The same cannot be said of Marie Armijo. Her husband had been shot to death only moments after the events in issue at appellant's trial, and her son was the State's principal witness. Her emotional investment in the case was clearly manifested by her outburst in the courtroom at the conclusion of Jose, Jr.'s testimony.

The majority derives far more from the somewhat lean analysis in *Green* than will withstand scrutiny. From the language quoted the majority identifies a "two-step

approach" to measuring abuse of discretion in enforcement of the rule. If the witness had no connection with the proponent's case in chief and was not contemplated as a "likely" witness at the outset "because of lack of personal knowledge regarding the offense," "no abuse of discretion can be shown." Only "if the witness was one who had personal knowledge of the offense and who the party clearly anticipated calling to the stand" will the test as refined in *Archer v. State*, supra, even come into play. In other words, rebuttal or impeachment witnesses are effectively insulated from enforcement of the rule. *Green* did not purport to mandate such a "two-step approach," however. There we merely observed that there are two identifiable classes of witnesses: those who were initially placed under the rule, and those who were not because not originally believed to be necessary either to the State's case in chief or to rebut anticipated defense evidence. There is no suggestion that a prejudice analysis would be inapposite to an appellate determination of whether permitting the testimony of a member of the latter class who has listened to all or portions of the trial was an abuse of discretion. There is only the observation that the witness Stevens was "not connected with the case in any way...." By this I perceive the Court meant it could imagine no respect in which Stevens' having heard the evidence at trial could have influenced the substance of her testimony. While this is at best a questionable application of the prejudice test ultimately adopted in *Archer*, supra, it plainly does not dispense with that test.

Nevertheless, on the dubious authority of *Green*, the majority recasts enforcement of the rule, without other precedent or any foundation in the language of Article 36.03, supra. I do not believe that vindication of the policy considerations underlying enforcement of the rule can in reason be made contingent upon the foresight (or lack of same) of the parties in predicting who their "necessary" witnesses will be.

Meaning to impute no bad faith on the part of the prosecution nor malice in the trial court, nonetheless, and limited to the facts of this particular case, I would hold that allowing Marie Armijo to testify in violation of the rule constituted an abuse of discretion. Because I believe a genuine miscarriage of justice has occurred, I respectfully dissent.

TEAGUE, J., joins.